940 F.2d 775
 56 Empl. Prac. Dec. P 40,903
 Dr. Ifeoma EZEKWO, Plaintiff-Appellant,
v.
NYC HEALTH & HOSPITALS CORPORATION; Harlem Hospital Center;
Columbia University, College of Physicians And
Surgeons; Dr. Linsy R. Farris,
Defendants-Appellees.
 No. 1400, Docket 90-9076.
 United States Court of Appeals,
Second Circuit.
 Argued April 17, 1991.
Decided Aug. 1, 1991.
 
 Michael H. Sussman, Goshen, N.Y., for plaintiff-appellant.
 Fred Kolikoff, Office of the Corp. Counsel, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Larry A. Sonnenshein, Michael Pleters, Office of the Corp. Counsel, New York City, of counsel), for defendants-appellees.
 Before TIMBERS, MESKILL and PRATT, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Dr. Ifeoma Ezekwo (Ezekwo), a medical doctor, appeals from a judgment of the United States District Court for the Southern District of New York, Metzner, J., entered on November 20, 1990. Following a bench trial, the district court ordered the dismissal of Ezekwo's claims for relief under 42 U.S.C. Sec. 1983 and the entry of judgment in favor of the appellees, New York City Health and Hospitals Corporation, Harlem Hospital Center, Columbia University College of Physicians and Surgeons, and Dr. Linsy R. Farris (collectively "defendants"). Ezekwo alleged that: (1) she was denied the position of "Chief Resident" because she exercised her First Amendment rights, (2) she possessed a constitutionally protected property interest in the position of "Chief Resident" which she was denied without due process, and (3) the defendants violated her right to due process by interfering with a protected liberty interest. The district court concluded that Ezekwo's written and verbal communications to her supervisors were not protected by the First Amendment and that her liberty interest had not been unconstitutionally infringed. Additionally, the district court held that Ezekwo possessed a legitimate claim of entitlement to the position of Chief Resident that rose to the level of a protected property interest. The court concluded, however, that the decision to deny Ezekwo the position of Chief Resident was based on academic criteria and that she had been afforded all the process that she was due.
 
 
 2
 We affirm in part, reverse in part and remand the case to the district court for the limited purpose of calculating damages.
 
 BACKGROUND
 
 3
 Dr. Ezekwo is a female medical doctor and a native of Nigeria. In March 1985, she was accepted into the ophthalmology residency program at Harlem Hospital Center (HHC). HHC is a unit of the New York City Health and Hospitals Corporation. Pursuant to a contract with the Health and Hospitals Corporation, HHC's ophthalmology department is administered and staffed by the College of Physicians and Surgeons of Columbia University. HHC patients are treated at a clinic located within the hospital and at an off-site clinic, the Sydenham Neighborhood Family Care Center.
 
 
 4
 Ezekwo began her residency program at HHC in July 1985. Dr. R. Linsy Farris (Farris) was the chief of HHC's ophthalmology department and director of the residency program. Dr. Milton Delerme was coordinator of the program and in charge of the residents. HHC's residency program requires three years of training and consists of nine residents--three for each training year. Residents in the program learn to diagnose and to treat eye disorders through lectures and the treatment of patients. Thirteen "attending physicians" supervise and provide guidance to the residents on a day-to-day basis.
 
 
 5
 The brochure, which HHC made available to prospective residents at the time Ezekwo was accepted, described the program and stated that each HHC resident would serve as "Chief Resident" for four months during his or her third year. The position of Chief Resident carried with it administrative and organizational responsibilities. Specifically, the Chief Resident was responsible for scheduling surgeries and lectures, and establishing work assignments. In addition, the resident who assumed the position received an increased salary and the designation of Chief Resident was of some future professional value. HHC's practice was to rotate third year residents through the position of Chief Resident. The sequence of rotation was based on alphabetical order in one year and then, in the following year, reverse alphabetical order. Appointment to the position of Chief Resident was never based on academic merit or any formal evaluative process.
 
 
 6
 The record indicates that Ezekwo's first year in the residency program went smoothly. During the latter half of her second year and the early stages of her third year, however, she began to direct several verbal complaints to Dr. Farris, the director of the program. Additionally, Ezekwo authored a series of letters and memoranda concerning areas of personal dissatisfaction. Ezekwo's complaints related to, among other things: (1) the failure of attending physicians and lecturers to be present at scheduled times, (2) the manner in which she was treated by Dr. Farris and the attending physicians, (3) the manner in which Dr. Farris evaluated her performance, (4) her lack of opportunity to perform surgery, (5) the lack of personal attention she received from the attending physicians, (6) the lack of proper hospital maintenance, (7) Dr. Farris' poor management and motivational skills, and (8) the poor teaching methods of the attending physicians.
 
 
 7
 In a memorandum dated April 10, 1987, Ezekwo challenged the "less than satisfactory" review that she received during her February 25, 1987 evaluation. She asserted that her poor evaluation was the product of "malice, discrimination and conspiracy" and "retaliation" for her outspoken opinions on how to improve the HHC residency program. Ezekwo threatened, "I will escalate this issue." She also advised Dr. Farris that she had filed a grievance against him with the Committee of Interns and Residents (CIR), the collective bargaining agent for interns and residents employed by the New York Health and Hospitals Corporation. On the same day, Ezekwo sent a letter to CIR requesting that a grievance be filed. In that letter, she alleged that Dr. Farris discriminated against her on the basis of her race and gender and retaliated against her for her comments about the program. Ezekwo highlighted her own skills and detailed incidents during which she allegedly was treated improperly by Dr. Farris.
 
 
 8
 On June 17, 1987, the end of her second year in the program, Ezekwo received her year end evaluation. In general, this review, like the earlier one, evaluated her performance in a variety of areas. Ezekwo generally received evaluations which ranged from satisfactory to above satisfactory. However, Ezekwo's surgical skills were graded as unsatisfactory. Her overall evaluation was 5.5--slightly above satisfactory. The evaluation was conducted by Doctors Farris and Delerme.
 
 
 9
 During the month of June 1987, Dr. Delerme met with all of the rising third year residents and advised them that their rotation as Chief Resident would take place in reverse alphabetical order--Solomon, Ezekwo and Castillo. Under this arrangement, Solomon would begin as Chief Resident in July and would continue in that position until the end of October. Ezekwo then would assume the responsibilities from November 1987 until the end of February 1988.
 
 
 10
 On June 29, 1987, Ezekwo wrote to HHC's equal employment opportunity (EEO) officer alleging that Dr. Farris was discriminating against her on the basis of race and gender. Ezekwo reasserted many of her former complaints and made new allegations including that Dr. Farris had fabricated information in her departmental file and engaged in "smear tactics" aimed at damaging her career as a physician. She again contacted the EEO officer on August 6, 1987, August 15, 1987, and September 25, 1987, concerning this alleged discrimination. In her August 15 letter, Ezekwo alleged discrimination on the basis of gender, race and national origin. She also stated that she was "being deprived the opportunity to learn surgery and specialised [sic] ophthalmic procedures" and was "being given wrong information regarding ophthalmic skills." It was not until October 1, 1987, that Dr. Farris received notification that Ezekwo had filed an EEOC complaint against him.
 
 
 11
 During June and July of 1987, Dr. Farris began discussing with other supervising physicians the possibility of not making Ezekwo Chief Resident. In August or September, Dr. Farris held a meeting with the attending physicians to discuss whether Ezekwo should succeed Solomon as the Chief Resident as previously scheduled. The consensus was that she should not, but the final decision was left to Dr. Farris. Dr. Farris conducted yet another meeting on October 16, 1987, aproximately two weeks prior to Ezekwo's scheduled date to become Chief Resident. At that meeting, Dr. Farris met with Dr. Delerme and some of the attending physicians, as well as the director of personnel at Columbia. During the course of this meeting, Ezekwo's academic performance, her medical skills, and her memo writing campaign were the focus of discussion. Indeed, the possibility of dismissing her from the program altogether was discussed. That same day the decision to go from a rotational system for selecting a Chief Resident to a "merit based" process was made. The change was announced by memorandum dated October 21, 1987 from Dr. Farris, addressed to all of the attending physicians and residents. That memorandum provided in pertinent part:
 
 
 12
 Emmanuel R. Solomon has accepted the appointment of Chief Resident in the Department of Ophthalmology to continue during the next four month resident rotation, November 1987 thru February 1988. His appointment represents a change in the previous practice of having every resident in Ophthalmology serve as Chief Resident for a four month rotation. We anticipate this change to improve the residency program as a result of the Chief Resident being selected on the basis of residency training evaluation, test scores and ability demonstrated in administration and leadership.
 
 
 13
 The memorandum's reference to test scores relates to a resident's performance on a national examination administered by the American Academy of Ophthalmology known as the OKAP examination. The OKAP exam is administered to ophthalmology residents at various stages of their training. The test scores evaluate an individual resident's performance relative to that of all others with similar training that have taken the examination. All HHC residents annually sit for the examination. Prior to the issuance of this memorandum, however, HHC never had utilized this information as a basis for selecting the Chief Resident.
 
 
 14
 After she was passed over for Chief Resident, Ezekwo continued to write memoranda protesting her treatment and complaining about inadequacies in the program. Specifically, she sent a memorandum dated November 20, 1987, to Dr. Farris in which she objected to the sudden change in the method of selecting a Chief Resident. Ezekwo alleged in the memo that the basis for denying her the position was Dr. Farris' desire to "decrease [her] surgical volume and to smear her reputation." She detailed her commitment to the program, noted her high level of performance, and reiterated her complaints about how the program was run. Ezekwo also attributed her poor performance on the OKAP exam to the inferior training that she had received at HHC. Ezekwo's memo writing campaign continued until the end of her residency.
 
 
 15
 In June 1988, Ezekwo successfully graduated from the residency program; she currently maintains a private medical practice in New York City. Ezekwo has not yet taken the examinations that would qualify her for Board certification. Ezekwo has applied for post-graduate fellowships in ophthalmology but has not been accepted into any program. She also has experienced difficulty in gaining admitting privileges at Montefiore Hospital Center and Our Lady of Mercy Medical Center, which, in part, can be attributed to the decision of some doctors at HHC not to write letters of recommendation.
 
 
 16
 Ezekwo initiated this action against the defendants on April 4, 1988 alleging violations of 42 U.S.C. Sec. 1983 and seeking $10 million in compensatory damages and $3 million in punitive damages as well as attorney's fees. In her complaint, she advanced three claims: (1) the defendants acting under color of state law violated her First Amendment right to free speech when they denied her the position of Chief Resident in retaliation for her complaints against Dr. Farris and the program, (2) she was denied a property interest without due process when she was passed over for Chief Resident in violation of the Fifth and Fourteenth Amendments, and (3) her liberty interest protected by the Fifth and Fourteenth Amendments was violated because the conduct of the defendants has stigmatized her and limited her professional opportunities.
 
 
 17
 After conducting a four day bench trial, the district court dismissed each one of these claims. In an opinion dated November 8, 1990, the district court concluded that Ezekwo's statements and memos did not relate to matters of public concern and, therefore, were not protected by the First Amendment. The court, finding that Ezekwo's future employment opportunities had not been foreclosed, rejected her liberty interest claim. Finally, although the district court determined that Ezekwo's claim of entitlement to the position of Chief Resident rose to the level of a property interest, it found that the basis for HHC's decision not to make her Chief Resident was purely academic and not disciplinary. Accordingly, the court held that prior notice and a hearing were not required. Pursuant to the district court's instructions, the complaint was dismissed and judgment was entered in favor of the defendants on November 20, 1990.
 
 DISCUSSION
 
 18
 Ezekwo contends that the district court's factual findings regarding the basis for HHC's decision to deny her the Chief Residency are clearly erroneous. Ezekwo argues that the decision was not an academic choice, but rather was an action taken to punish her and to retaliate for her outspoken criticism of Dr. Farris and the HHC program. She, therefore, submits that some form of due process hearing was required. Additionally, Ezekwo challenges the district court's determination that her speech was not entitled to First Amendment protection as a matter of law. Regarding the district court's decision to dismiss Ezekwo's liberty interest claim, we note that the parties have not challenged the correctness of that decision either in their briefs or during oral argument. We, therefore, do not address that issue here.
 
 A. Standard of Review
 
 19
 In reviewing the decision below we must determine whether the district judge applied the correct legal principles and whether his findings of fact were "clearly erroneous." Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir.1985); Fed.R.Civ.P. 52(a) ("findings of fact ... shall not be set aside unless clearly erroneous"). We give considerable deference to the district court's credibility assessments and to its determination as to what inferences should be drawn from the evidence in the record. Puritan Ins. Co., 779 F.2d at 871; see also 9 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2585, at 731 (1971). Accordingly, the factual findings of the district court will not be set aside unless they are without adequate support in the record, are against the clear weight of the evidence, or are the product of an erroneous view of the law. 9 Federal Practice & Procedure Sec. 2585, at 734-35; Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 261 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). When reviewing a district court's legal conclusions, our scope of review is de novo. 9 Federal Practice & Procedure Sec. 2588, at 750.
 
 B. The First Amendment Claim
 
 20
 It is well established that a public employer cannot discharge or retaliate against an employee for the exercise of his or her First Amendment free speech right. Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). As the Supreme Court has counselled: "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987). Recognizing the competing interests involved, the Supreme Court has concluded that a court's task is to seek a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).
 
 
 21
 A public employee who claims to have been discharged or disciplined for the exercise of First Amendment rights must establish two elements to prevail on the claim: (1) that the conduct at issue was protected speech; and (2) that the speech played a substantial part in the employer's adverse employment action; i.e., that the adverse action would not have occurred but for the employee's protected actions. See Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Givhan v. Western Line Consol. School District, 439 U.S. 410, 416-17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).
 
 
 22
 Here, the district court never addressed the second issue because it concluded as a matter of law that Ezekwo's conduct was not protected speech. The issue of whether certain speech is protected by the First Amendment is one of law for the court. See Connick v. Myers, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1691 n. 7, 75 L.Ed.2d 708 (1983). The pertinent question is whether the speech at issue can "be fairly characterized as constituting speech on a matter of public concern." Id. at 146, 103 S.Ct. at 1690. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. at 1690. Only if the statements involved address a matter of public concern is it necessary for a court to balance the interests of the speaker against the state's interest in efficient government. Rankin, 483 U.S. at 388, 107 S.Ct. at 2899. The mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his views publicly does not alter the analysis. See Givhan, 439 U.S. at 414, 99 S.Ct. at 696. To hold that certain speech by a public employee does not relate to matters of public concern, however, is not to say that such speech is beyond the protection of the First Amendment in all respects. Connick, 461 U.S. at 147, 103 S.Ct. at 1690. Instead, it merely indicates that not all speech by a public employee can provide the basis for a constitutional cause of action. Id. The requirement that the speech at issue involve matters of public concern "reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter." Id. at 143, 103 S.Ct. at 1688.
 
 
 23
 Viewed objectively and as a whole, Ezekwo's statements did not address matters of public concern. Her complaints were personal in nature and generally related to her own situation within the HHC residency program. Our review of her prolific writings convinces us that Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor. As the Connick Court succinctly observed:
 
 
 24
 To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.
 
 
 25
 Id. at 149, 103 S.Ct. at 1691. The district court correctly reasoned that the mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements. As the Connick Court emphasized:
 
 
 26
 We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.
 
 
 27
 Id. at 147, 103 S.Ct. at 1690 (internal citation omitted). Ezekwo's statements did not relate to matters of public concern and the district court correctly so held.C. Due Process/Property Right
 
 
 28
 Ezekwo asserts that she was denied the Chief Resident position, a property right, without due process. The district court concluded that Ezekwo did possess a property interest in the Chief Resident position, but because the decision was academically motivated, no process was due. Ezekwo submits that the district court erred in finding that the decision was academically based. HHC and the other appellees argue that the district court's decision should be upheld. Additionally, they offer an alternative basis for affirming the district court's disposition of this claim. They assert that the court erred as a matter of law in concluding that Ezekwo possessed a property interest. Of course, if this were true, the protections of the Fifth and Fourteenth Amendments would be rendered inapplicable.
 
 
 29
 While the Fourteenth Amendment's procedural requirements protect property, that property can take many forms. In general, the nature and contours of a specific property interest are defined by some source independent of the Constitution--most often state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The term " 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' " Sindermann, 408 U.S. at 601, 92 S.Ct. at 2699 (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." Id. (citation omitted). As the Roth Court declared: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709.
 
 
 30
 The defendants argue that Ezekwo only had a unilateral expectation of becoming Chief Resident because neither her individual written contract nor the residents' collective bargaining agreement mentions any formal right to the Chief Residency. We disagree. While the presence of such a provision obviously would make the existence of the right much more apparent, its absence does not foreclose the possibility that Ezekwo possessed a "property" interest in the Chief Resident position. See Sindermann, 408 U.S. at 601, 92 S.Ct. at 2699. In Sindermann, the Supreme Court noted that principles of contract law recognize that not every term of a contract must be reduced to writing. Additional contractual provisions may be "implied" into a contract as a result of a course of dealing between the parties. The parties through their conduct and practice can create additional rights and duties. Id. at 602, 92 S.Ct. at 2700 (university's adherence to a particular pattern of conduct could create an expectation of continued employment in employees who lacked tenure).
 
 
 31
 While state law defines the underlying substantive interest, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709). In particular, not every contractual benefit rises to the level of a constitutionally protected property interest. "It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a [state actor] into a federal claim." San Bernardino Physicians' Services Medical Group v. County of San Bernardino, 825 F.2d 1404, 1408 (9th Cir.1987); see also Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir.1987) (a simple contract dispute does not give rise to a cause of action under section 1983).
 
 
 32
 We reject the defendants' attempt to equate the instant situation with cases dealing with the denial of certain employment benefits. A close examination of those cases reveals the weakness of this argument. While every breach of a public employment contract may not be a deprivation of property within the meaning of the Due Process Clause, see Brown v. Brienen, 722 F.2d 360, 364 (7th Cir.1983), the adverse action taken in this case was not the product of routine discipline. Compare Carter v. Western Reserve Psychiatric Habilitation, 767 F.2d 270, 272 n. 1 (6th Cir.1985). Nor did it involve such a trivial and insubstantial interest as the purported right to a specific vacation period. Compare Altman v. Hurst, 734 F.2d 1240, 1242 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). Here, the "policies and practices" of the institution were such that an entitlement to the position of Chief Resident existed and the district court correctly so held.
 
 
 33
 The dissenting opinion agrees with the defendants that this case merely presents a situation in which a public employee is denied a particular work assignment or employment benefit--interests that are not entitled to the protections afforded by the Due Process Clause. We, however, find that characterization to be unpersuasive and to ignore the special nature of the Chief Resident designation as well as the particular facts of this case. In Brienen, 722 F.2d 360, the case upon which the dissenting opinion places a great deal of reliance, deputy sheriffs alleged that the sheriff had denied them property without due process when he refused to permit them to take off accrued compensatory time as had previously been promised. Id. at 362. In rejecting the claim, the Brienen Court simply recognized the rather obvious principle of law that not every breach of a contractual right rises to the level of a deprivation of property. Id. at 364-65. Nevertheless, the Brienen Court acknowledged that certain contractual rights are entitled to federal protection under the Fourteenth Amendment.
 
 
 34
 In determining which interests are afforded such protection, a court must look to whether the interest involved would be protected under state law and must weigh "the importance to the holder of the right." Id. at 364. Here, HHC adopted a policy and practice of awarding the position of Chief Resident to all third year residents on a rotating basis. This method of selection was not haphazardly applied; it was an established practice which was expressly highlighted in HHC's informational documents. While we can find no evidence in the record concerning how long this method of selection was utilized, it is plain that the practice predated Ezekwo's admittance to the program and continued while she was there. Ezekwo's expectation of obtaining the position was further enhanced when she was verbally advised in June 1987 that she would be Chief Resident from November 1987 until February 1988. Thus, Ezekwo consistently had been informed that she would rotate through the position of Chief Resident and receive a salary differential as a result of that designation. We think that this course of conduct, coupled with Ezekwo's reasonable reliance thereon, created a contractual right that rose to the level of a significant property interest that would be protected under state law. See id. Moreover, Ezekwo's interest in the position of Chief Resident was more than merely financial. To a member of the medical profession the designation of Chief Resident is of special importance because it denotes the culmination of years of study. Additionally, it is necessary a position that an individual can occupy only once in his or her career. Thus, unlike the trivial interest at issue in Brienen, the interest at stake here, due in large part to the very nature of medical training itself, was of significant professional value. Accordingly, we agree with the district court that Ezekwo's expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to the protections afforded by the Due Process Clause.
 
 
 35
 Having found the existence of a property interest, we must now determine whether Ezekwo received the process that she was due. To determine what, if any, procedural protections the Constitution requires, we must consider:
 
 
 36
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 37
 Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In some instances, it also has been held that the availability under state law of a post-deprivation hearing or tort remedies completely will satisfy due process and bar a section 1983 claim. See, e.g., Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203-04, 82 L.Ed.2d 393 (1984) (state tort remedy adequate protection for alleged intentional destruction of prisoner's property); Parratt v. Taylor, 451 U.S. 527, 541-44, 101 S.Ct. 1908, 1916-17, 68 L.Ed.2d 420 (1981) (state tort action sufficient protection for alleged negligent destruction of prisoner's property), overruled in part, Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986) (mere negligence on part of state official cannot work a constitutional deprivation of property); see also Ramsey v. Board of Educ. of Whitley County, Kentucky, 844 F.2d 1268, 1273 (6th Cir.1988) (state contract action adequate remedy for denial of accumulated sick days); Costello, 811 F.2d at 784 (grievance procedure was sufficient remedy for retired police officers' claims of denial of increase in pension benefits).
 
 
 38
 Recently, in Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court, seeking to clarify its earlier decisions, identified the circumstances under which the availability of post-deprivation state remedies will bar a section 1983 claim. The Zinermon Court concluded that its earlier decisions in Parratt and Hudson stand for the principle that in some instances a deprivation of property may be so random and unpredictable that the provision of pre-deprivation proceedings is impossible. Both Hudson and Parratt involved claims by prisoners who alleged that prison guards had destroyed their property. In those cases, the Court held that the state could not forsee when the deprivation would occur and its ability to provide pre-deprivation process was non-existent. The Zinermon Court contrasted these prior cases with a situation in which the alleged deprivation was predictable, pre-deprivation procedures were possible, and the alleged improper conduct was taken by those who were acting within their authority. Id. at 989-90.
 
 
 39
 In the instant case, HHC's residency directors and doctors carefully deliberated about changing the method of selection for Chief Resident before deciding to apply that new standard, thereby denying Ezekwo the position. Plainly, the conduct of these officials was not random or unpredictable. The situation was well suited to the use of pre-deprivation processes. See id. Moreover, in denying Ezekwo the position, the program directors were not acting beyond their delegated authority; they possessed the authority "to effect the very deprivation complained of here." Id. at 990. These officials were responsible for all aspects of the residency program and their discretion was essentially unrestricted. Thus, the potential availability of a state law contract action does not bar this suit. The next question, of course, is what, if any, process was due Ezekwo.
 
 
 40
 The district court found that the basis for HHC's decision to pass over Ezekwo was purely academic and, therefore, no process was due. While concerns about Ezekwo's interpersonal skills and combative nature may have been justified and, indeed, may have provided an independent basis for denying her the position, the injection of entirely new selection criteria at the eleventh hour casts some doubt on the truly "academic" nature of the decision.
 
 
 41
 Even assuming the academic nature of the decision, we are of the opinion that Ezekwo was due at least some modicum of process. The district court appears to have been operating on the assumption that in all instances where academic decisions are involved no process is due. In making its determination, the district court relied on Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Horowitz establishes the principle that in most instances when academic decisions are involved courts should not impose formal procedural requirements, for there, the academic process provides sufficient procedural protections. Id. at 85, 98 S.Ct. at 952. We, however, do not understand Horowitz to impose a blanket prohibition on judicial intervention. Moreover, Horowitz is distinguishable from the instant case.
 
 
 42
 Horowitz involved a medical student who was dismissed from the University of Missouri-Kansas City Medical School during her final year of study for failure to satisfy academic standards. The medical student, prior to her dismissal from the program, had been advised of the faculty's dissatisfaction with her clinical progress and informed that these problems could jeopardize her continued participation in the program. Id. at 80-81, 98 S.Ct. at 950. The decision to dismiss the student was careful and deliberate and the institution had an "historically supported interest ... in preserving its ... framework for academic evaluations." Id. at 86 n. 3, 98 S.Ct. at 953 n. 3. Considering all of the relevant factors, the Supreme Court concluded that the Due Process Clause did not require any "hearing" beyond the formal procedures provided by the academic evaluation process and expressed its hesitancy to invade the area of academic evaluations:
 
 
 43
 Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.
 
 
 44
 Under such circumstances, we decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing.
 
 
 45
 Id. at 90, 98 S.Ct. at 955. Thus, the Horowitz Court emphasized the importance of judicial deference to academic decisions. However, the institution in Horowitz had long established academic criteria and repeatedly had advised the student involved that her performance was not meeting those standards, and that if it did not improve, she would be precluded from continued enrollment. Id. at 85, 98 S.Ct. at 952. Such is not the situation presented here.
 
 
 46
 The decision to pass over Ezekwo directly resulted from HHC's decision to adopt entirely new selection criteria. These new criteria were not made known to residents in the program until after the final decision on Ezekwo had been made. Such conduct is insufficient to satisfy due process. While a medical residency program is largely an academic undertaking, it also is an employment relationship. This is most clearly evidenced by the existence of formal employment contracts and collective bargaining agreements. In light of these circumstances, we believe that some minimal steps should have been taken to inform the parties who stood to be adversely affected by HHC's change in the method of selection and to provide them with some opportunity to demonstrate either that their past performance satisfied the new criteria or that the criteria should not be applied to them. While it is unlikely that the administrators would have reversed the decision to change the selection criteria, Ezekwo should have had an opportunity to persuade the administrators to delay the implementation of the new criteria until her expectations had been fulfilled. Our decision to impose such a process requirement neither threatens the academic integrity of the residency program nor does it undermine the institution's academic freedom. Finally, the financial and administrative burden that such a requirement imposes would be minimal.
 
 
 47
 It warrants emphasis that this is not a case in which the residency program administrators believed that Ezekwo presented a threat to patient safety. Of course, in such a situation, the program administrators would be justified in immediately removing the resident subject to some post-removal review. Such is not the case here. Indeed, the administrators permitted Ezekwo to remain in the program, to perform surgeries, and to graduate from the program. Given these circumstances, the failure to provide some form of pre-deprivation process cannot be excused. See Caine v. Hardy, 905 F.2d 858, 860-62 (hospital must provide hearing to doctor before revoking staff privileges), reh'g in banc granted, 905 F.2d at 867 (5th Cir.1990). HHC, at a minimum, should have informed Ezekwo of the basis for its action and should have provided her with an opportunity to respond to its concerns before a final decision was made. These steps could have been accomplished through informal procedures; no formal hearing was required.
 
 
 48
 We, therefore, hold that the district court erred in concluding that the requirements of the Due Process Clause were satisfied. Accordingly, we reverse the judgment of the district court as to that claim. The only evidence of actual damage suffered by Ezekwo as a result of the deprivation of due process was the loss of the pay differential that accompanied the designation of Chief Resident. On remand, therefore, the district court's damages inquiry should be limited to calculating that amount. Costs also should be awarded to the appellant. Our review of the record demonstrates that an award of punitive damages is unwarranted.
 
 CONCLUSION
 
 49
 The district court correctly concluded that the statements at issue did not involve matters of public concern and, therefore, were not protected by the First Amendment. However, the district court erred in concluding that the requirements of the Due Process Clause had been satisfied. HHC and the residency program directors should have notified Ezekwo of the change in policy and given her an opportunity to address their concerns before utilizing the policy against her. Accordingly, the judgment of the district court is reversed as to that claim and the case remanded solely for a calculation of compensatory damages. The district court, of course, also will have to resolve the issue of attorney's fees.
 
 
 50
 TIMBERS, Circuit Judge, concurring in part and dissenting in part:
 
 
 51
 To the extent that the majority affirms the district court's rejection of appellant's first amendment claim, I concur. To the extent that it reverses the district court's holding that appellant was not denied due process, I dissent.
 
 
 52
 In reversing the district court today on the due process claim, the majority holds that a medical resident was due "some modicum of process" before supervisors of a medical residency program changed the way they chose chief residents. Because I agree with the district court that the chief residency decision was a purely academic one for which no additional process was required, and because I further believe that appellant Ezekwo had no constitutionally protected property interest in the first instance, I respectfully dissent from that portion of the majority opinion that reverses the district court on the ground that Ezekwo was denied due process.
 
 I.
 
 53
 Turning first to the factual findings made by the district court, while the majority gives lip-service to the oft-quoted standard that a district court's findings of fact will not be set aside unless "clearly erroneous," Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2 Cir.1985), it gives short shrift to the district court's explicit finding that the chief residency determination "was academic and not disciplinary in nature"--a distinction that is critical in assessing Ezekwo's due process claim. The majority states that "the injection of entirely new selection criteria at the eleventh hour casts some doubt on the truly 'academic' nature of the decision."
 
 
 54
 In my view, the majority gives insufficient weight to the findings of the district court. The Supreme Court has admonished that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (emphasis added). After hearing testimony and reviewing evidence during a four-day bench trial, the district court specifically found that:
 
 
 55
 "The determination not to appoint plaintiff as Chief Resident during the second trimester was based on deficiencies in her performance in the residency, particularly in the area of interpersonal relationships, and on her lower OKAP scores. The determination was not the result of any charge of misconduct against her. Accordingly, the determination was academic and not disciplinary in nature and is akin to cases involving dismissal from school programs for academic reasons."
 
 
 56
 These findings are "thorough, careful and comprehensive. They come to us 'well armed with buckler and shield.' " DeGuio v. United States, 920 F.2d 103, 106 (1 Cir.1990) (quoting Horton v. United States Steel Corp., 286 F.2d 710, 713 (5 Cir.1961)). Far from being clearly erroneous, the district court's findings here are solidly supported by the record. There simply is no basis in the record for the majority's "doubt" with respect to the accuracy of those findings.
 
 II.
 
 57
 Turning next to the majority's statement that "[e]ven assuming the academic nature of the decision, we are of the opinion that Ezekwo was due some modicum of process", I agree with the district court that appellees were constitutionally permitted, in the manner in which they did, to make an academic change in the criteria used for selecting chief residents.
 
 
 58
 Before addressing the question of the process due Ezekwo, it is necessary to inquire whether she had a constitutionally protected property interest in serving a term as chief resident. "The question whether there was a deprivation of property is logically prior to the question whether there was a denial of due process...." Brown v. Brienen, 722 F.2d 360, 363 (7 Cir.1983). I think the majority rushed too quickly to answer in the affirmative the question whether Ezekwo had such a property interest.
 
 
 59
 In Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Supreme Court held that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." While "the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).
 
 
 60
 The district court held that "[p]laintiff had more than a unilateral expectation of being Chief Resident; the position was offered to applicants as a consideration for applying for the [residency] position." Likewise, the majority held that, even though Ezekwo's "right" to be chief resident was expressed in neither her individual contract nor the residents' collective bargaining agreement, her "expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to the protections of the Due Process Clause."
 
 
 61
 Both the district court and the majority appear to rely largely on implied elements of her contract in holding that Ezekwo had a protectible property interest in the position of chief resident. As the majority itself recognized, however, not every contractual benefit rises to the level of a constitutionally protected property interest. Rather, "[a] mere breach of a contractual right is not a deprivation of property, and thus is not actionable under Sec. 1983. There is a distinction between contract interests and protectible property interests." Walentas v. Lipper, 636 F.Supp. 331, 335 (S.D.N.Y.1986). Even where a public employment contract is involved, "not every breach ... is a deprivation of property within the meaning of the due process clause." Brown, supra, 722 F.2d at 364; see also Costello v. Town of Fairfield, 811 F.2d 782, 784 (2 Cir.1987) ("A contract dispute ... does not give rise to a cause of action under section 1983."). Thus, even if one assumes that appellees breached a contractual obligation, it does not necessarily follow that they deprived Ezekwo of a constitutionally protected property interest.
 
 
 62
 In Rode v. Dellarciprete, 646 F.Supp. 876, 880 (M.D.Pa.1986), vacated in part on other grounds, 845 F.2d 1195 (3 Cir.1988), the court held that "personnel decisions short of termination do not constitute deprivations of a property interest under the Fourteenth Amendment." See also Parrett v. City of Connersville, 737 F.2d 690, 693 (7 Cir.1984) ("we [have] expressed doubt whether a lateral transfer, involving no loss of pay, could ever be sufficient deprivation to violate the Fourteenth Amendment. A contrary conclusion would subject virtually all personnel actions by state and local government agencies to potential federal damage suits under 42 U.S.C. Sec. 1983--a breathtaking expansion in the scope of that already far-reaching statute, and one remote from the contemplation of its framers"); Brown, supra, 722 F.2d at 364-65 ("A breach of contract that does not terminate the employment relationship is different.... [T]he Constitution must not be trivialized by being dragged into every personnel dispute in state and local government. Disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment."); Lewandowski v. Two Rivers Public School Dist., 711 F.Supp. 1486, 1495 (E.D.Wis.1989) ("mere transfers and reassignments have generally not been held to constitute a constructive discharge or to implicate a constitutionally protected property interest") (collecting cases); Wargat v. Long, 590 F.Supp. 1213, 1215 (D.Conn.1984) (following analysis of Brown and specifically holding that decisions involving plaintiff state trooper's "transfer [with loss in pay] from one position to another and the failure to promote him ... are not of a magnitude requiring the plaintiff's employer to afford him due process of law").
 
 
 63
 "Only interests substantial enough to warrant the protection of federal law and federal courts are Fourteenth Amendment property interests. Whether an interest is that substantial depends on the security with which it is held under state law and its importance to the holder." Brown, supra, 722 F.2d at 364 (citation omitted). In holding that Ezekwo's interest in being chief resident rose to such a level, the majority invokes the Supreme Court's decision in Perry v. Sindermann, 408 U.S. 593, 602-03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), where the Court held that respondent was entitled to prove that he had a "legitimate claim of entitlement to continued employment" based on the policies and practices of the college by which he was employed. The majority also relies on Roth, supra, which, while holding that an "abstract concern" in being rehired did not constitute a property interest, 408 U.S. at 578, 92 S.Ct. at 2710, articulated the familiar standard that a "legitimate claim of entitlement" can give rise to a property interest. Id. at 577, 92 S.Ct. at 2709. Both Roth and Sindermann involved the right to employment itself. Cf. Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (due process requires some kind of hearing "prior to the discharge of an employee who has a constitutionally protected property interest in his employment"), aff'g 721 F.2d 550 (6 Cir.1983). Outside the employment context, the Supreme Court has held that due process applies to the withdrawal of welfare benefits, Goldberg v. Kelly, 397 U.S. 254, 261-62, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970), and to the termination of Social Security disability benefits. Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). As the Court explicitly stated in Mathews, "the interest ... in ... these benefits is a statutorily created 'property' interest protected by the Fifth Amendment." Id.
 
 
 64
 I have difficulty in equating the non-realization of Ezekwo's expectation of serving a term as chief resident with the loss of employment or of subsistence benefits. As we have stated, "[t]hus far, the course of the law in this Circuit has not moved beyond according procedural due process protection to interests other than those well within the contexts illustrated by Goldberg and Roth." S & D Maintenance Co. v. Goldin, 844 F.2d 962, 967 (2 Cir.1988). In that case, we held that S & D's "right" to continue a contract with the City "would not be a [constitutionally] protected right, even if we were to analogize S & D's service contract to an employment contract." Id.; see also Walentas v. Lipper, 862 F.2d 414, 419 (2 Cir.1988) ("[T]he Court has carefully limited the rule to situations which involve contracts with tenure provisions and the like, or where a clearly implied promise of continued employment has been made. Courts have accordingly been wary of the consequences that might arise if section 1983 were expanded to encompass substantially all public contract rights." (citations omitted)), cert. denied, 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989). It is just such expansion which concerns me today.
 
 
 65
 It should be borne in mind that Ezekwo was not terminated from her position as an ophthalmology resident. Rather, she was simply not permitted to serve a four-month term as chief resident. Appellees made this decision based strictly on academic criteria. While I agree with the majority that Ezekwo's interest in serving as chief resident was not "such a trivial and insubstantial interest as the purported right to a specific vacation period," see Altman v. Hurst, 734 F.2d 1240, 1242 (7 Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984), I do equate her interest with that of an employee who has been denied a promotion or a specific job assignment. See Lewandownski, supra, 711 F.Supp. at 1495; Wargat, supra, 590 F.Supp. at 1215; see also Brown, supra, 722 F.2d at 365. The majority points to no court which has yet held that such an interest rises to the level of a protected property interest. Rather, I find persuasive the reasoning of those courts which have found that employment decisions short of termination do not involve property rights. As the Supreme Court has cautioned, "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." Bishop v. Wood, 426 U.S. 341, 349, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).
 
 
 66
 Moreover, in an academic context such as this case presents, I think we should be particularly wary of finding property rights that are not firmly grounded in state law. See Board of Curators v. Horowitz, 435 U.S. 78, 82, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978) (involving dismissal from medical school) ("Respondent has never alleged that she was deprived of a property interest. Because property interests are creatures of state law, Perry v. Sindermann, 408 U.S. 593, 599-603, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972), respondent would have been required to show at trial that her seat at the Medical School was a 'property' interest recognized by Missouri state law. Instead, respondent argued that her dismissal deprived her of 'liberty' by substantially impairing her opportunities to continue her medical education or to return to employment in a medically related field.") (holding process sufficient, even if a protected liberty or property interest were assumed). If every change in academic policy that affected students' expectations were found to implicate property interests, schools might well be reluctant to upgrade standards or to make other decisions that traditionally have been left largely to the discretion of academic decisionmakers. While the majority states that "the adverse action taken in this case was not the product of routine discipline," I believe that, consistent with the factual findings of the district court, it was the product of legitimate academic decisionmaking and not, for example, a retaliatory decision that might implicate due process concerns on that basis. Cf. Brown, supra, 722 F.2d at 365 ("A public employer who harassed an employee in order to induce him to give up a substantive constitutional right, such as freedom of speech, would be violating the Fourteenth Amendment and section 1983.").
 
 
 67
 I would hold that appellees made an academic decision to change the policy with respect to the position of chief residency, and that this decision did not implicate a protected property interest of appellant Ezekwo.
 
 III.
 
 68
 Even if I were to agree with the majority that Ezekwo's interest in the chief residency position rose to the level of a protected property interest, I would hold, as did the district court, that she was given all the process that was due. It is to this question of "due process" that I now turn.
 
 
 69
 In determining what procedural protections are required by the Constitution, I consider the factors articulated by the Court in Mathews, supra:"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
 
 
 70
 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 71
 As in Brown, supra, "the 'property' of which [Ezekwo was] deprived, if property it is in a Fourteenth Amendment sense ..., is far down on the scale of Fourteenth Amendment interests." 722 F.2d at 366. Moreover, in the wake of the Supreme Court's decision in Horowitz, supra, I think it is treading on thin ice to impose additional procedural requirements in the context of an academic decision such as this one.
 
 
 72
 In Horowitz, a case involving an outright dismissal from medical school and thus implicating an interest far greater than Ezekwo's in simply serving as chief resident, the Supreme Court indicated a strong reluctance to interfere in academic affairs. In that case, the Court held that academic dismissal decisions, unlike disciplinary dismissal decisions, were not amenable to a hearing requirement:
 
 
 73
 "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement.... The decision to dismiss respondent ... rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.
 
 
 74
 Under such circumstances, we decline to ignore the historic judgment of educators and therefore formalize the academic dismissal process by requiring a hearing.... We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship."
 
 
 75
 435 U.S. at 89-90, 98 S.Ct. at 954-55.
 
 
 76
 The majority attempts to distinguish Horowitz on the ground that the institution involved there had "long established academic criteria and repeatedly had advised the student involved that her performance was not meeting those standards", whereas:
 
 
 77
 "The decision to pass over Ezekwo directly resulted from HHC's decision to adopt entirely new selection criteria [which] were not made known to residents in the program until after the final decision on Ezekwo had been made. Such conduct is insufficient to satisfy due process. While a medical residency program is largely an academic undertaking, it also is an employment relationship."
 
 
 78
 I do not find the majority's attempts to distinguish Horowitz to be persuasive. Although arguably more process was accorded Horowitz than Ezekwo, Horowitz's interest was substantially greater. Moreover, there is nothing in Horowitz to suggest that the "process" afforded Horowitz represented some type of constitutional minimum. The school in that case informed Horowitz that her clinical progress was unsatisfactory, warned her that there was a danger that she would not graduate, allowed her to be examined by seven physicians, and then ultimately made a "careful and deliberate" decision to dismiss her. Horowitz, supra, 435 U.S. at 85, 98 S.Ct. at 952. In this case, the majority itself states that "HHC's residency directors and doctors carefully deliberated about changing the method of selection for Chief Resident before deciding to apply that new standard." The mere fact that Ezekwo was not warned in advance of the change or given an opportunity to argue about it does not represent a denial of due process.
 
 
 79
 As the district court stated, we held in Campo v. New York City Employees' Retirement System, 843 F.2d 96, 103 (2 Cir.), cert. denied, 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988), that an Article 78 proceeding in a New York State court offered a due process hearing "at a meaningful time and in a meaningful manner" in a case involving rights to survivor's benefits under a pension. The district court held that Ezekwo "failed to avail herself of the available process to air her claim." In addition to having had the opportunity to commence an Article 78 proceeding, Ezekwo may well have a legitimate contract action. See Campo, supra, 843 F.2d at 103 n. 7. These postdeprivation remedies are relevant in assessing the process that Ezekwo had available to her.
 
 
 80
 The majority states that in Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court recently held that the availability of postdeprivation state remedies will not bar a Sec. 1983 claim in cases other than those in which the alleged deprivation is so random and unpredictable that the provision for predeprivation proceedings is impossible. E.g., Parratt v. Taylor, 451 U.S. 527, 541-44, 101 S.Ct. 1908, 1916-17, 68 L.Ed.2d 420 (1981) (state tort action sufficient protection for alleged intentional destruction of prisoner's property), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). In Burch, however, the Court limited itself to assessing the propriety of a Rule 12(b)(6) dismissal, and held that respondent had adequately alleged a claim for relief in a case involving the involuntary commitment of a mentally ill person. 110 S.Ct. at 977. The Court held that the case was not precluded by Parratt. Id. at 989.
 
 
 81
 I do not read Burch as suggesting that predeprivation remedies are always required in cases other than those involving random and unpredictable deprivations such as that at issue in Parratt. Nor do I read Burch as making irrelevant the consideration of other postdeprivation remedies in assessing the adequacy of constitutional process. Indeed, the Court explicitly acknowledged that "[i]n some circumstances, ... the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." Id. at 984; see also Loudermill, supra, 470 U.S. at 542 n. 7, 105 S.Ct. at 1493 n. 7 ("There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements."). An example cited in Burch is Ingraham v. Wright, 430 U.S. 651, 682, 97 S.Ct. 1401, 1418, 51 L.Ed.2d 711 (1977), where the Court held that the due process clause does not require notice and a hearing before the imposition of corporal punishment in public schools "as that practice is authorized and limited by the common law". The Court held that "imposing additional administrative safeguards as a constitutional requirement might reduce [the] risk [of violating a child's rights] marginally, but would also entail a significant intrusion into an area of primary educational responsibility." Id.
 
 
 82
 Burch simply held that the facts of that case did not fall within the reach of those cases not requiring a prior hearing under the special rationale of Parratt. Burch involved the alleged involuntary confinement of an individual, which confinement the Court described as implicating a "substantial liberty interest". Id. at 986. In this case, where only an insubstantial, if any, property interest was involved, the existence of postdeprivation remedies in the wake of a legitimate academic decision afforded Ezekwo all the process that was due. As the court held in Ramsey v. Board of Educ. of Whitley County, 844 F.2d 1268, 1272 (6 Cir.1988), "an employee deprived of a property interest in a specific benefit, term, or condition of employment, suffers a loss which is defined easily ... and therefore, any interference with that interest is redressed adequately in a state breach of contract action." (Emphasis added.)
 
 
 83
 Finally, in the context of considering the Mathews factors, I agree with the majority that "it is unlikely that the administrators would have reversed the decision to change the selection criteria" even if additional process had been accorded Ezekwo. This serves to support my view that any additional "process" requirements would represent only an unnecessary administrative burden.
 
 IV.
 To summarize:
 
 84
 The district court properly rejected appellant's first amendment claim.
 
 
 85
 The district court finding that the chief residency decision was an academic decision is amply supported by the record and is not clearly erroneous. Ezekwo's interest in the position did not rise to the level of a constitutionally protected property interest but, even if it did, Ezekwo was afforded all the process that she was due.