Ruling on Motion for Summary Judgment of Defendants University of Connecticut, Robert Smith, and Fred Maryanski [Doc. # 32]
 

 ARTERTON, District Judge.
 

 Plaintiff Ramesh Malla’s five count second amended complaint alleges employment discrimination based on race, color, and national origin in violation of 42 U.S.C. § 2000e-2(a)(l) against defendant University of Connecticut (“UConn”), racial discrimination in violation of 42 U.S.C. § 1981 against defendants University of Hartford and Sallie Townsend, exclusion from participation in and denial of benefits of federally funded programs based on race, color, and national origin in violation of 42 U.S.C. § 2000d against defendants University of Hartford and Townsend,
 
 [1]
 
 violation of due process under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 against defendants Robert Smith and Fred Maryanski in their individual capacities only, and aiding and abetting UConn’s alleged employment discrimination and Smith’s and Maryanski’s
 
 *CCCL
 
 alleged due process violation
 
 [2]
 
 against defendants University of Hartford and Townsend. Before the Court is defendants UConn’s, Smith’s, and Maryanski’s motion for summary judgment [Doc. # 32] on the two counts directed against them, employment discrimination against UConn and due process violation against the individuals. For the reasons set forth below, the motion is GRANTED with respect to plaintiffs employment discrimination claim but DENIED with respect to Malla’s due process claim.
 

 1. Background
 

 Malla, who is identified in plaintiffs opposition as “Asia-American of brown skin from Nepal,” Opp’n [Doc. # 38] at 1, began his employment in 1985 with UConn as non-tenured faculty in the Department of Civil Engineering, and currently works as a tenured Associate Professor in and Associate Head of the same department at UConn’s main campus in Storrs, Connecticut. Malla is a member of the American Association of College and University Professors (“AAUP”), and subject to its Connecticut chapter’s collective bargaining agreement with UConn,
 
 see
 
 Maryanski
 
 Ml
 
 [Doc. # 36] Ex. C.
 

 Defendant Robert Smith was employed by UConn from September 1, 1997 to June 30, 2000 as Vice Provost for Research and Graduate Education and Dean of the Graduate School. As such, he is the chief research officer at UConn, reports to the Chancellor, has signature authority on all grants and contracts related to research, and is the coordinator and supervisor for all programs of research at UConn.
 

 Maryanski has been employed by UConn since 1983, served as Interim Chancellor and Provost from 1999 through 2000, and currently serves as Vice Chancellor for Academic Administration. As Chancellor and Provost, he was the chief academic and operating officer and responsible for managing the operation of UConn. He also was responsible for coordinating and supervising all of UConn’s programs of instruction and research, and for coordinating the formulation of policies and administration of all its schools, colleges, divisions, institutes and regional campuses.
 

 From February 1991 to April 2000, Mal-la served as the Campus Director for UConn of the Connecticut Space Grant College Consortium (“Consortium”) and as Principal Investigator at UConn for the Experimental Program to Stimulate Competitive Research Preparation Grant Program (“EPSCOR”). Until 2001, the Consortium consisted of UConn, University of Hartford, University of New Haven, and Trinity College. The program has its origin in a call from NASA in the Fall of 1990 for several states to establish Space Grant Consortiums. Malla assumed the major role for UConn of drafting and submitting a grant proposal and, after it was accepted, he was named the principal investigator for the program at UConn. The proposal itself identified who would be the Campus Director at each of the original four member institutions of the Consortium, and was signed by UConn by both its president and its Dean of Engineering. The program was funded in 1991.
 

 
 *CCCLI
 
 Participants in EPSCOR included 41 faculty members from ten academic institutions in Connecticut, including UConn, University of Hartford, Yale University, Connecticut College, Central Connecticut State University, Eastern Connecticut State University, Southern Connecticut State University, Trinity College, University of New Haven, and Three River Community College. University of Hartford was the lead institution for EPSCOR, shouldering managerial and fiscal responsibility for the program and selecting the Consortium Director. Under NASA guidelines, the Project Director position for EPSCOR is filled by the same individual selected as Consortium Director.
 

 By letter dated April 14, 2000, defendant Smith removed Malla from the position of Campus Director for the Consortium at UConn, and three days later, on April 17, replaced him with Daniel Civco, a white male. Malla’s removal did not alter his status as Associate Professor or Associate Head, or result in a diminution of his professorial salary. Malla did not file a formal grievance with the AAUP to contest his removal as Campus Director. It is Malla’s removal from the Campus Director position and the surrounding circumstances that form the basis of his claims against UConn, Smith, and Maryanski. Additional facts are set forth below as necessary to the understanding of the Court’s disposition of defendants’ motion.
 

 II. Summary Judgment Standard
 

 Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). Where a party moves for summary judgment on a claim on which the non-moving party bears the burden of proof at trial, the moving party has the initial responsibility to identify those portions of the record which together with affidavits, if any, demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party’s claim.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then go beyond the pleadings and by her own affidavits, or by evidentiary support found in the court or discovery record, designate specific facts demonstrating a genuine issue of material fact on any element essential to the non-moving party’s case that was sufficiently called into question by the moving party.
 
 See id.
 
 The “District Court must resolve any factual issues of controversy in favor of the non-moving party,”
 
 Lujan v. Nat’l Wildlife Fed’n,
 
 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), mindful that “at the summary judgment stage the judge’s function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The District Court’s ultimate concern is “whether there is a need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Id.
 
 at 250, 106 S.Ct. 2505.
 

 III. Title YII Analysis
 

 Title YII employment discrimination cases are analyzed under the familiar
 
 McDonnell Douglas
 
 /
 
 Burdine
 
 burden-shifting framework. First, the plaintiff must establish a
 
 prima facie
 
 case of discrimination on account of race, color, or national origin.
 
 See Weinstock v. Columbia
 
 
 *CCCLII
 

 Univ.,
 
 224 F.3d 33, 42 (2nd Cir.2000). If the plaintiff meets this requirement, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee’s termination.
 
 See id.
 
 “For the case to continue, the plaintiff must then come forward with evidence that the defendant’s proffered, nondiscriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.”
 
 Id.
 
 (quotation omitted).
 

 A.
 
 Prima Facie
 
 Case
 

 To meet the burden required to show a prima facie case of discrimination, plaintiff Malla must establish: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class.
 
 See e.g., McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973);
 
 Graham v. Long Island Rail Road,
 
 230 F.3d 34, 38 (2d Cir.2000). No one particular type of proof is required to satisfy the fourth element, rather it may take a variety of forms,
 
 see Abdu-Brisson v. Delta Air Lines, Inc.,
 
 239 F.3d 456, 466-68 (2d Cir.2001), including showing that plaintiffs position was filled with an individual outside of his protected class,
 
 see e.g., Cook v. Arrowsmith Shelburne, Inc.,
 
 69 F.3d 1235, 1239 (2d Cir.1995).
 
 See also Texas Dep’t of Comm. Affairs v. Burdine,
 
 450 U.S. 248, 253-54 and n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);
 
 McDonnell Douglas,
 
 411 U.S. at 802 and n. 13, 93 S.Ct. 1817.
 

 Defendants do not challenge the first three elements of Malla’s
 
 prima facie
 
 case. They argue that there is no evidence satisfying the fourth element with respect to Malla’s removal as Campus Director.
 
 See
 
 Mem. in Supp. of S.J. [Doc. #33] at 9. Defendants focus on the purported absence both of direct evidence of discrimination and evidence showing that Malla was treated less favorably than a similarly situated employee outside his protected group.
 
 See generally id.
 
 at 9-ll.
 
 [3]
 
 Defendants misapprehend the low threshold of proof necessary to establish a prima facie case. Malla here meets defendants’ challenge to the fourth element sim
 
 *CCCLIII
 
 ply by pointing out that, three days after his removal as Campus Director, his position was filled with a person outside of his protected class, Civco, a white male,
 
 see
 
 Malla Aff. ¶ 15, a fact defendants do not appear to dispute.
 

 B. Legitimate Reason for Discharge
 

 Because Malla has established a
 
 prima facie
 
 case, “[t]he burden therefore shift[s] to [defendants] to produce evidence that the plaintiff was [removed] for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment.”
 
 Reeves v. Sanderson Plumbing,
 
 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations, quotations, and alterations omitted), and is satisfied if the proffered evidence “ ‘taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.’ ”
 
 Schnabel v. Abramson,
 
 232 F.3d 83, 88 (2d Cir.2000)
 
 (quoting St. Mary’s Honor Ctr. v. Hicks,
 
 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).
 
 [4]
 

 Defendants maintain that Malla was removed from the position of Campus Director of the Connecticut Space Grant College Consortium on April 14, 2000 by Defendant Smith due to “difficulties in communications and interpersonal relations with the Space Grant Principal Investigator, and a confirmation from the NASA Program Manager of these interpersonal issues and support for his removal as Director.” Robert Smith Aff. [Doc. # 35] ¶ 9;
 
 see also
 
 Maryanski Aff. [Doc. #36] ¶ 8 (“Dr. Ramesh Malla was removed as Campus Director of the Connecticut Space Grant College Consortium due to difficulties in interpersonal relations and establishing productive working relationships with other officers of the Consortium.”). In support, UConn submits the affidavits of Maryanski, Defendant Smith, and Regina Smith
 
 [5]
 
 with attachments, which reveal the history and nature of Malla’s disputatious relationships.
 

 From Spring 1999 through April 2000, UConn received notice of Malla’s interpersonal and working relationship issues from Defendant Townsend and Laurie Granstrand of the University of Hartford. During this time frame, Regina Smith, Assistant Vice Provost for Research and Executive Director of the Office for Sponsored Programs from January 1999 to June 2001,
 
 [6]
 
 reviewed “all information
 
 *CCCLIV
 
 made available to the University of Connecticut relevant to allegations of working relationship issues of Dr. Malla as Campus Director of the Connecticut Space Grant College Consortium...Regina Smith Aff. [Doc. # 37] ¶ 10. Regina Smith met personally with Malla on several occasions to discuss and receive his response to the allegations of communication and working relationship issues, as well as had telephone and electronic mail communications with him on the subject.
 

 On December 13, 1999, defendant Townsend wrote to UConn’s Maryanski about Malla’s interpersonal and working relationship deficiencies:
 

 It is with reluctance, but of necessity, that I am writing to you to request that we replace Ramesh Malla as the University of Connecticut’s Campus Director for the CT Space Grant College Consortium. Ramesh has been the primary force in impeding progress toward our goals of improving the CT Space Grant program as well as hampering Connecticut’s participation in NASA’s EPSCOR program. As I am sure you know, hav,ing problems with Ramesh has been a long-term issue for the Consortium. My concern is that now he has expanded the scope of negativity beyond the team of Campus Directors and Consortium management.
 

 As a Campus Director, Ramesh has consistently opposed any attempt on my part to place the grant back in the good graces of NASA. He has sent several broadcast e-mails during this year that were disrespectful to me and, in my opinion, have done great harm to our program. After the September 9th Campus Directors meeting, the Program Manager, Laurie Granstrand, and I discussed his past and present behavior with him and decided to give him one last chance for improvement. Examples and direction for change that would support our stated goal of moving the Consortium forward into the future were candidly discussed. Ramesh denied any wrongdoing even though we cited specific instances of his inappropriate behavior. He indicated he was unaware of his negativity. Should you wish a synopsis of the meeting, I would be happy to share this with you.
 

 Ramesh has chosen a part of not working within the Consortium to voice his concerns and effect any change. Instead he chooses to go directly to NASA headquarters with many petty issues. In addition to consistent attacks on the Space Grant management team, he has presented our program negatively to UConn, the State and to NASA. Here are some specific concerns:
 

 • We are aware through student contact that Ramesh has run down the Space Grant program on your campus.
 

 • We learned from NASA staff that Ramesh had been ‘airing’ dirty laundry about the CT Space Grant Consortium and expressing his displeasure with the management structure of the EPSCOR Program while visiting the Johnson Space Flight Center.
 

 • His handling of his thrust area coordinator position on the EPSCOR Preparation Grant has been inappropriate. As far as we can tell, he has not kept non-UConn faculty informed. In fact, he was denigrating and rude to a participating Faculty Member at another institution by stating that they were ‘token’ members of EPS-COR. This is a statewide grant to facilitate research and collaborations with NASA Centers; our goals are to
 
 *CCCLV
 
 represent the State in the best possible light and foster cooperation between CT research institutions and NASA.
 

 • Ramesh has undermined the management of EPSCOR by the inappropriate assumption of a lead role in coordinating this program, thereby usurping my authority as director. As a result, he has misled at least three other coordinators. All thrust areas are in competition for survival for the next proposal, and only the strongest will survive the next round. He therefore has gained an unfair advantage over the others. As I am not at UConn, it is not easy for me to detect and stop this behavior in real time. I also have concerns about allowing him to continue as the thrust coordinator for the Structures and Materials area due to his consistent attempt to ‘take over’ the program.
 

 Ramesh is counterproductive in promoting the Space Grant to UConn by misrepresentation and by the way he works with the Consortium as a whole. As a result, I believe it is in the best interests of the State, the Consortium and the University of Connecticut to effect a change in leadership on the UConn campus. Through conversations with officials in your Research Foundation, we know that there are other NASA-funded investigators at UConn whose outreach activities and/or research interests fit with the Space Consortium’s mission. They are:
 

 • Chester Arnold, Jr., Extension Educator, Cooperative Extension Systems
 

 • Daniel Civco, Ph.D., College of Agricultural & Natural Resources
 

 • Robert Colwell, Ph.D., College of Liberal Arts & Sciences
 

 We would appreciate the opportunity to approach, interview and discuss this opportunity with each of them and to invite your input.
 

 In summary, my job as Program Director of the CT Space Grant Consortium and EPSCOR Preparation Grant is to promote NASA related research in our state, to promote NASA in the State of Connecticut, and to enhance Connecticut’s image within the NASA community. Ramesh’s actions are counterproductive to the achievement of these objectives. I believe we have done all we can to rectify the situation to no avail and, since time is of the essence, I feel it is necessary at this time to effect a change in Space Grant leadership on the UConn campus.
 

 Maryanski Aff. [Doc. # 36] Ex. B. The letter was copied to University of Hartford’s provost and Defendant Smith, and blind copied to Regina Smith.
 
 See id.
 
 This was the first formal complaint about Malla UConn had received, and Maryanski directed Defendant Smith and Regina Smith to review Townsend’s communication and Malla’s relationship issues.
 
 See
 
 Maryanski Aff. ¶ 10.
 

 On March 31, 2000 and on June 2, 2000, Regina Smith, Defendant Smith, and Malla met together, and, according to defendants, Malla “was provided: (1) the reasons supporting the decision to remove him as Campus Director; (2) an explanation and presentation of the information supporting the decision to remove him; and (3) an opportunity to respond to the information and present his position.” Regina Smith Aff. [Doc. # 37] ¶ 12; Robert Smith Aff. [Doc. # 35] ¶ 12. Between the two meetings,
 
 [7]
 
 by letter dated April 14,
 
 *CCCLVI
 
 2000, Malla was notified of his removal by Defendant Smith. The body of the letter provides,
 

 I have received your April 11, 2000 letter in which you state your intention not to step down from the position as the University of Connecticut Director of the Connecticut Space Grant College Consortium.
 

 When we met on March 31, 2000, Gina Smith and I reviewed the reasons why we were asking you to step down graciously, including the following:
 

 — The difficulties in communications and interpersonal relations between you and the Space Grant Principal Investigator which are jeopardizing the operations of the program;
 

 •— The agency Program Manager’s understanding of these difficulties and support of the Principal Investigator’s wish that you be dismissed from your responsibilities as Director.
 

 Accordingly and based on the authority vested in me (as Vice Provost for Research and Graduate Education) by the Space Grant College Consortium, I am removing your appointment effective immediately.
 

 While I appreciate your efforts on behalf of the University, I regret that you did not see the wisdom of the advice we shared with you on March 31, 2000. But, there are significant University-wide reasons for taking the action consummated by this letter.
 

 On April 17, 2000, I will announce the appointment of a new University of Connecticut Director of the Connecticut Space Grant College Consortium. I hope you will give this person your full cooperation.
 

 Robert Smith Aff. [Doc. # 35] Ex. A.
 

 The sixty to seventy pages of electronic mail correspondence attached to Regina Smith’s affidavit gives a contemporaneous picture of the tumultuous situation, much of which predates Townsend’s December 13, 1999 letter to Maryanski and Robert Smith’s April 14, 2000 removal letter to Malla. Most was either contemporaneously sent, copied, or forwarded to Regina Smith.
 

 In July 1999, there arose a matter of contention between Townsend, who had managerial responsibility for Connecticut’s Space Grant Program and the EPSCOR NASA grant, and Malla over whether the University of Hartford would distribute the NASA grant to UConn under one subcontract, Malla’s preferred method, or five, Townsend’s preferred method.
 
 [8]
 

 August 1999 saw the culmination of a confrontation over the differing views of Townsend and Malla regarding how concrete or abstract the Affiliates Committee on Consortium Membership’s future plans had to be, particularly with respect to re-
 
 *CCCLVII
 
 eruitment of new affiliates in industry. Townsend personally replaced Malla as chair of the committee.
 
 [9]
 
 Later that month, Malla wrote Regina Smith with a copy to Defendant Smith proposing that the leadership of the Connecticut Space Grant Consortium be shifted from Townsend and the University of Hartford to UConn.
 
 [10]
 

 Deterioration in the relationship continued up to and after Malla’s removal, culminating (at least in the summary judgment record) in September of 2000 with Townsend asking Regina Smith to remove Malla from any position of responsibility following Malla’s aggressive message to Townsend informing her that it was “highly unreasonable and inappropriate of you to ask me to contact/visit Dan Civco’s office to fetch the compendium.... Isn’t it your responsibility that each of the Thrust Coordinators get a copy of the compendium? ... (That means interrupt my work, face inconvenience and spend 3(M0 minutes of time to just fetch the compendium).” Electronic Mail of Malla to Townsend (forwarded to Regina Smith) dated September 1, 2000.
 
 [11]
 

 Also included in Regina Smith’s affidavit as material reviewed prior to Malla’s removal are Townsend’s notes from a September 9, 1999 meeting between Malla, Townsend, and Granstrand. The notes characterize the meeting as “somewhat heated” and memorialize “several directives” given to Malla by Townsend, including “never again refer[ing] to Laurie or me as his secretary....” and “ceas[ing] going behind [Townsend’s] back in coup attempts or any other negative activity.”
 

 Finally, defendants point to Malla’s deposition testimony that he received regular raises in pay since becoming tenured, that he was appointed an associate professor and associate department head in 1998, and that he had the support of UConn and Maryanski in recruiting other institutions in Connecticut for membership in the Consortium, all as showing the absence of discriminatory motive. Defendants’ proffered evidence, if believed, would certainly permit the conclusion that Malla was removed for non-discriminatory reasons.
 

 
 *CCCLVIII
 
 C. Malla’s Rebutting Evidence
 

 Malla must now “come forward with evidence that the defendant’s proffered, non-discriminatory reason is a mere pretext for actual discrimination.”
 
 Weinstock,
 
 224 F.3d at 42. Malla may satisfy this burden with evidence sufficient to establish “... a
 
 prima facie
 
 case, combined with sufficient evidence to find the employer’s asserted justification is false.... ”
 
 Reeves,
 
 530 U.S. at 148, 120 S.Ct. 2097;
 
 see also Zimmermann v. Associates First Capital Corp.,
 
 251 F.3d 376, 381 (2d Cir.2001)
 
 (“Reeves
 
 instructed that the combination of evidence establishing a
 
 prima facie
 
 case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient nor always to be deemed insufficient.”). Even with such evidence, however, “an employer is [nonetheless] entitled to judgment as a matter of law if the record conclusively revealfs] some other, nondiscriminatory reason for the employer’s decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer’s reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred.”
 
 Reeves,
 
 530 U.S. at 148, 120 S.Ct. 2097.
 

 Despite Malla’s voluminous opposition, the Court concludes that no reasonable jury could find from it that defendants’ proffered grounds for removal were a pretext for discrimination. The evidentiary submissions of defendants, particularly those attached to Regina Smith’s affidavit, provide abundant and uncontroverted evidence that no discrimination occurred, namely that UConn removed Malla because of his perceived inability (regardless of fault) to work with Townsend, the individual in charge of Connecticut’s Space Grant program and correspondingly the EPSCOR grant. While the Court has considered all of the proffered evidence and argument, the following discussion does not respond to every detail of plaintiffs opposition but addresses only the most cogent arguments and supporting evidence.
 

 1. Townsend’s Letter of December 13,1999
 

 Malla’s analysis of how a jury could reasonably conclude that no investigation or only a sham investigation was conducted is not supported by the 103 page excerpt of Townsend’s deposition testimony provided by plaintiff.
 
 See
 
 Townsend Depo. (03/13/2003) 7:7-109:2 & 122:18-123:1; Opp’n [Doc. # 38] at 8. It does not support the inference plaintiff asks to be drawn, that Townsend could not “substantiate the veracity of the allegations [of the December 13, 1999 letter],” Opp’n [Doc. # 38] at 9, and therefore Regina Smith did not conduct an investigation because she could not have verified Townsend’s allegations. While Townsend during the deposition, which was taken in 2003, often testified that she did not remember events, conversations, or other matters that had occurred in 1999-2000, she provided in detail the factual foundation undergirding the statements in the December 13, 1999 letter, including where an investigator could look for further information, if necessary.
 
 See e.g.,
 
 Townsend Depo. (03/13/2003) at 19:11-13;
 
 [12]
 
 37:6-15;
 
 [13]
 
 
 *CCCLIX
 
 38:5-39:13;
 
 [14]
 
 44:5-15;
 
 [15]
 
 47:16-48:8;
 
 [16]
 
 78:7-79:20;
 
 [17]
 

 see also id. e.g.,
 
 90:13-92:3; 97:22-99:21; 115:2-23
 
 [18]
 
 .
 
 [19]
 
 Thus, any sug-
 
 *CCCLX
 
 gestión that Townsend’s lack of personal knowledge by itself with respect to some items in the letter would preclude investigation into the accuracy of the letter’s contents lacks evidentiary support.
 

 Plaintiff also attempts to artificially set the December 13, 1999 letter as some kind of investigatory cutoff, asking the inference to be drawn that, absent consideration of events occurring before that date, Regina Smith’s inquiry into Malla’s relationships with Townsend and NASA could not have supported removing Malla for poor working relationships and thus such inquiry must have been a sham. There is no basis for such an artificial cabining of Regina Smith’s investigation. Regina Smith’s affidavit (undisputed in this regard) states that her investigation included review of all electronic mails attached to her affidavit, many of which predate December 13, 1999 and demonstrate that she was intimately knowledgeable about the relationship between Malla and Townsend at least as of early July 1999, fully five months prior to Townsend’s December 13, 1999 letter.
 
 See
 
 Regina Smith Aff. [Doc. # 37] ¶ 10-11, Ex. A. Indeed, Malla often contemporaneously forwarded correspondence from this time period to Regina Smith.
 
 See id.
 
 Ex. A. Thus, while a jury could conclude reasonably that Townsend’s letter of December 13, 1999, triggered Regina Smith’s
 
 formal
 
 inquiry, a reasonable jury could not conclude that her investigation solely looked into the allegations of Townsend’s letter and therefore that Mal-la’s removal was based solely on those allegations.
 
 See
 
 Defendant Smith Depo. (03/24/2003) at 25:25-26:12;
 
 [20]
 

 see also id.
 
 at 53:4-15;
 
 [21]
 
 Maryanski Depo. (03/18/2003) at 12:8-13; 76:19-25.
 

 Similarly, plaintiff places great significance on the fact that Regina Smith provided the names of the three replacement applicants suggested in Townsend’s December 13, 1999 letter, asking the inference to be drawn that Regina Smith was inputting into Malla’s removal before any investigation had even begun. Such reliance is misplaced as it relies on the same artificial dichotomy between the pre and post December 13, 1999 status of UConn’s knowledge, which cannot be maintained in
 
 *CCCLXI
 
 light of the overwhelming abundant and uncontroverted record evidence revealing Regina Smith’s and UConn’s knowledge about Malla’s serious interaction problems with Townsend and NASA long before December 13, 1999.
 
 See e.g.,
 
 Regina Smith Aff [Doc. #37] Ex. A.; Robert Smith Depo. (03/24/2003) at 69:9-12.
 
 [22]
 
 Townsend was asked by UConn to make her complaints formal by putting them in writing,
 
 see e.g.
 
 Townsend Depo. (03/13/2003) at 114:18-24,
 
 [23]
 
 and, prior to writing the letter, Townsend sought input from Regina Smith regarding who would be a suitable replacement for Malla, in response to which Regina Smith provided the names of individuals who were familiar working with NASA grants.
 

 Finally, even if a jury credited Malla’s testimony that the allegations in Townsend’s letter of December 13, 1999 were untrue and thereby discredited defendants’ claim of having verified the accuracy of Townsend’s statements, such conclusion would not demonstrate the falsity of defendants’ stated reason for removal, problems with working relationships. Even if the problems in the working relationship could have been traced to Townsend and were not the product of Malla’s conduct, the stated basis for removal, friction and contention with the statewide Director of the Consortium, would still be true.
 

 2. Procedural Deficiencies in Malla’s Removal
 

 Malla also attempts to show that Regina Smith’s investigation was a sham (or nonexistent) by pointing to what plaintiff char-aeterizes as a “mode of operation ... not consistent with good business practice and more consistent with concealing a secret[,] ... discrimination.” Opp’n [Doc. # 38] at 11. While UConn’s methodology in going about Malla’s removal may not have included the creation of a written report with attached substantiating evidence that was shared with Malla and formal opportunity to rebut all the evidence set forth therein, in the absence of some evidence demonstrating that such methodology was required by UConn’s own disciplinary policies and procedures, none of this evidence casts doubt on UConn’s stated reasons for removal.
 

 3. Nature of Problem with Townsend
 

 Plaintiff also proffers an argument that is difficult to understand but appears to be that Malla’s difficulties with Townsend were professional and not personal and that therefore “a reasonable jury could find that UConn breached the trust owed to Plaintiff because UConn wanted to give the Campus director position to Dr. Civ-co.”
 
 See
 
 Opp’n [Doc. #38] at 13-14. What is problematic about Malla’s argument is that almost all of the evidence cited in support substantiates the existence of a substantial amount of friction between Malla and Townsend, including Malla’s deposition admission that he knew Townsend was not happy with him. Even though Malla characterizes the discord as a professional and not personal problem, his evidence supports defendants’ proffered explanation that Malla’s poor working relationship with the head of the Consortium
 
 *CCCLXII
 
 and EPSCOR program required change in UConn’s Campus Director position.
 

 4. Conclusion
 

 A complete review of all evidence offered by plaintiff does not support the inference that UConn’s stated reason for removing Malla from his position as campus director was false. As set forth above, overwhelming and undisputed evidence in the record establishes that Malla and Townsend could not work together, that NASA personnel confirmed Malla’s working relationship problems, and that, as a result, UConn decided to make a change. Nothing provides a basis for rational jurors to conclude that UConn did not make the change because of poor working relationships, and nothing suggests that the change was made because of race, color, or national origin. Accordingly, UConn is entitled to summary judgment on Count One of Malla’s second amended complaint.
 

 IV. Due Process Violation
 

 It is well established that “the Fourteenth Amendment’s Due Process Clause requires ... (1) determination of] whether the claimant has a property interest, [and] then (2) determin[ation of] whether []he received adequate process before being deprived of that interest.”
 
 Harhay v. Town of Ellington Bd. of Educ.,
 
 323 F.3d 206, 212 (2d Cir.2003). Maryan-ski and Smith argue they are entitled to summary judgment on Malla’s due process claim under both prongs. They claim: 1) Malla was not deprived of a property right protected under the Fourteenth Amendment as a result of removal from the position of Campus Director of the Consortium; and 2) In the alternative, even if Malla had a constitutionally protected property interest in the position, any process due was satisfied by the procedures available to Malla under the AAUP’s collective bargaining agreement with UConn, of which UConn asserts he failed to take advantage, meetings with Regina Smith during the Fall of 1999, the meeting with Regina Smith and defendant Smith on March 31, 2000, and the meeting on June 2, 2000 with Regina Smith, defendant Smith, defendant Maryanski, Dr. Erling Murtha-Smith, Head of department of Engineering, AAUP Executive Director Ed Marth, and Assistant Vice-Chancellor Virginia Miller.
 

 A. Federally Protected Property Right
 

 Maryanski and Defendant Smith argue that Malla had no federally protected property right in his position as Campus Director of the Consortium so that a decision to remove him did not entitle him to any due process, including a pre or post deprivation hearing. Defendants contrast Malla’s position as a tenured faculty member of UConn, which they point out is created and defined by the university’s laws, by-laws and rules of the board of trustees, with Malla’s position as Campus Director of the Consortium from 1991 to 2000, which they argue has no independent source creating and defining it under state law. Therefore, they conclude Malla has no claim of entitlement to the position and it does not constitute protected property under the Fourteenth Amendment under
 
 Board of Regents of State Colleges v. Roth,
 
 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and
 
 Ezekwo v. New York City Health and Hosp. Corp.,
 
 940 F.2d 775 (2d Cir.1991). In support, Maryanski states: “I am not aware of any University ByLaw, policy, regulation or contract in connection with the appointment or designation of Campus Director of the Connecticut Space Grant College Consortium at the University of Connecticut.” Maryanski Aff. [Doc. # 36] ¶ 7.
 

 
 *CCCLXIII
 
 Malla argues that the source of his entitlement to the position of Campus Director arises from an implied provision of a contract with UConn (presumably for his position as a tenured professor) that was created by the course of dealing between UConn and him. Malla relies on
 
 Ezekwo,
 
 940 F.2d 775. For evidentiary support, plaintiff points to his service as Campus Director from 1991 to 2000, his own expectation that he would remain Campus Director for as long as there was a Space Grant Consortium,
 
 see
 
 Malla Depo. (03/14/2003) at 26:10-15, and the defendants’ acknowledged power of appointing and removing individuals from the position of Campus Director.
 
 See
 
 Robert Smith Depo. (03/24/2003) at 39:16-23;
 
 [24]
 
 41:22-42:6.
 
 [25]
 
 Malla also claims that he received $2,500 per year for serving as campus director and that the position was not subject to annual review, but does not submit the corresponding deposition testimony to which he cites for both propositions.
 
 [26]
 
 Although not pointed to by Malla as evidence supporting a finding of a constitutionally protected property right, the record contains testimony from Malla’s deposition in which he states that UConn has a custom pursuant to which the writer of a grant is entitled to be the lead principal investigator on it if received, Malla was the writer and recipient of the original grant for the Consortium at UConn, the president of UConn signed the original grant application in which it was stated that Malla would be the principal investigator at UConn, and the Dean of Engineering included a letter in the original grant application to the same effect.
 
 See
 
 Malla Depo. (03/14/2003) at 21:4-26:15. UConn does not dispute Malla’s deposition testimony.
 

 On these facts, if proved, the Court believes that, under controlling Second Circuit law,
 
 [27]
 
 Malla had a federally protected property right in his position as Campus Director for UConn of the Consortium. “Property interests are not created by the Constitution; rather ‘they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.’ ”
 
 Ciambriello v. County of Nassau,
 
 292 F.3d 307, 313 (2d Cir.2002)
 
 (quoting Bd. of Regents of State Colls. v. Roth,
 
 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). “[T]hat property can take many forms ... [and] ‘[a] person’s interest in a benefit is a ‘property’ interest for due process purposes if there are such rules or mutually
 
 *CCCLXIV
 
 explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.’”
 
 Ezekwo,
 
 940 F.2d at 782
 
 (quoting Perry v. Sindermann,
 
 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). A claim of entitlement is not precluded by absence of a formal right memorialized in an individual contract or a collective bargaining agreement because “not every term of a contract must be reduced to writing[, and] [additional contractual provisions may be implied into a contract as a result of a course of dealing between the parties. [Thus,] [t]he parties through their conduct and practice can create additional rights and duties.”
 
 Id.
 
 (quotation omitted). While “not every contractual benefit rises to the level of a constitutionally protected property interest,”
 
 id.,
 
 UConn’s “policies and practices ... were such that an entitlement to the position of [Campus Director] existed,”
 
 id.
 
 at 783.
 

 In
 
 Ezekwo,
 
 the Second Circuit concluded Dr. Ifeoma Ezekwo had a property interest under state law and the Constitution in her expectation of becoming Chief Resident in the third year of her ophthalmology residency program at Harlem Hospital Center (“HHC”), where HHC adopted a policy and practice of awarding the position of Chief Resident to all third year residents on a rotating basis, the policy was expressly highlighted in HHC’s informational documents, Ezekwo’s expectation was enhanced when she was verbally advised in June 1987 that she would obtain the position beginning in November of the same year, the position included a salary increase, Ezekwo relied on HHC’s course of conduct, and a member of the medical profession would have considered the designation of Chief Resident of special importance because it denotes culmination of years,of study and can only be occupied once.
 
 See id.
 
 “Accordingly, [the Second Circuit agreed] with the district court that Ezekwo’s expectation of performing the duties of Chief Resident was reasonable and well founded and rose to the level of a property interest entitled to protections afforded by the Due Process Clause.”
 
 Id.
 

 The Court thinks Malla’s interest in the Campus Director position is at least as strong as Ezekwo’s was in the Chief Resident one. Malla had already occupied the position for nine years. He had spearheaded UConn’s response to the call from NASA for grant applications. The application explicitly identified Malla as the lead investigator should the grant be funded, the president of UConn signed the application, and the Dean of Engineering submitted a letter stating that Malla would be the lead investigator if the grant was awarded. Malla stated in deposition testimony, unrebutted by UConn, that UConn follows a custom and practice pursuant to which the grant writer is entitled to the lead role if the grant is awarded. Further, the Court does not think it speculation to conclude that, analogous to
 
 Ezekwo,
 
 there is special importance in the academic community to being the lead writer, recipient, and investigator on a grant, and to holding that position for the duration of the grant, which in the present case was for nine years. Support for this proposition can be found in a letter written by Dr. Erling Murtha-Smith, Head of the Department of Civil and Environmental Engineering, on behalf of Malla to Maryanski. The letter is dated June 12, 2000 and was written after Dr. Murtha-Smith attended Malla’s June 2, 2000 meeting with university officials. It reads in pertinent part,
 

 Professor Malla was an original PI on the Space Grant proposal and as PI “owns” a substantial part of that proposal and the continued award. In addition, it is my understanding that Professor Malla put together the EPSCOR investigator team at UConn and from
 
 *CCCLXV
 
 many of the other participating institutions. Further, it is my understanding that he also developed or compiled most of the narrative of the proposal. Thus, his intellectual property in this proposal includes not only his own technical contribution, but also his selection, invitation, and assembly of the team of investigators without whom there would be no proposal. This ownership of a substantial part of the Space Grant Consortium proposal and awards and the EPS-COR proposals and awards cannot be taken from him.
 

 See
 
 Murtha-Smith Mem. (06/12/2000) at 1-2. Accordingly, having found that plaintiff has raised a genuine issue of material fact on factual questions underlying the conclusion that he had a constitutionally protected property interest, the Court moves to a consideration of the process afforded Malla prior to his removal.
 

 B. Process Provided or Available to Malla
 

 1. Parties’ Arguments
 
 [28]
 

 Maryanski and Smith also argue that Malla received all process he was due. Here, defendants point to Malla’s allegedly having failed to “utilize the procedures available to him under the Collective Bargaining Agreement^ ... and thus conclude] plaintiff cannot allege he has been deprived of his due process rights under the Fourteenth Amendment without first exhausting the remedies available to him under the CBA.” Mem. in Supp. of S.J. [Doc. # 33] at 17. For evidentiary support, defendants point to article 10 of Mal-la’s collective bargaining agreement, asserting “the CBA afforded the Plaintiff the right to a
 
 de novo
 
 appeal and, as a part of that process, a full evidentiary hearing [and][t]hereafter, the Plaintiff had the right to pursue arbitration,” Mem. in Supp. of S.J. [Doc. # 33] at 19;
 
 see also
 
 Maryan-ski Aff. [Doc. # 36] Ex. C, Malla’s deposition testimony that, although he wrote to his AAUP on several occasions requesting a formal grievance, he did not remember whether one had been filed,
 
 see
 
 Malla Depo. (03/14/2003) at 34:14-35:1, and Mar-yanski’s affidavit testimony that Malla did not file a formal grievance under AAUP collective bargaining agreement over his removal,
 
 see
 
 Maryanski Aff. [Doc. # 36] ¶ 13.
 

 Defendants argue that “the review of the University of Connecticut in combination with the review and remedies available pursuant to the CBA grievance/arbitration procedure, fully satisfies the requirements of due process.” Mem. in Supp. of S.J. [Doc. #33] at 21. Defendants point to interactions, including meetings, electronic mail, and telephone conversations, between Regina Smith and Malla during the Fall of 1999 addressing issues related to Malla’s working relationship with Townsend and others in the Consortium,
 
 see
 
 Regina Smith Aff. [Doc. #37] ¶ 11 and Ex. A, Malla’s meeting with Regina Smith and Robert Smith on March 31, 2000, at which defendants represent Malla was provided “the reasons supporting the decision to remove him as Campus Director, an explanation and presentation of the information supporting the decision to remove him, and an opportunity to respond to the information and present his position,”
 
 id.
 
 ¶ 12; Robert Smith Aff. [Doc. # 35] ¶ 12, and Malla’s post removal meeting of June 2, 2000 with university officials
 
 *CCCLXVI
 
 and AAUP Executive Director Ed Marth, at which defendants say Malla was provided with the same explanation, information, and “yet another opportunity to address the issues of interpersonal difficulties within the Space Grant Consortium.” Mem. in Supp. of S.J. [Doc. #33] at 19;
 
 see
 
 Regina Smith Aff. [Doc. # 37] ¶ 12; Robert Smith Aff. [Doc. # 35] ¶ 12; Maryanski Aff. [Doc. # 36] ¶ 11.
 

 Malla makes a two-pronged challenge to consideration of the availability of process under the collective bargaining agreement to which he is subject. First, Malla challenges the applicability of the agreement to his removal from his position as Campus Director. He points to his post-removal use of the agreement’s “open communication provision,” Opp’n [Doc. #38] at 20, which, by its terms, covers “problems,”
 
 see
 
 Maryanski Aff. [Doc. # 36] Ex. C ¶ 10.1.
 
 [29]
 
 Pursuant to that provision, Malla’s AAUP representative Edward Marth requested a meeting with, among others, Maryanski, “to review what information was used in the decision to remove Prof. Malla from his position with the space consortium,” Electronic Mail of Edward Marth (05/04/2000), noting that he “was under the impression that [Malla] was not given a chance to review the facts, which may well be in dispute, about why the change was made,”
 
 id.
 
 Maryanski agreed to the meeting the following day conditioned on Regina Smith’s attendance and all parties being represented.
 
 See
 
 Electronic Mail of Fred Maryanski (05/05/2000). The meeting requested by Marth is the June 2, 2000 meeting between Malla and university officials. Malla thus contrasts his use of the open communication provision with the availability of the procedure under the collective bargaining agreement available for formal grievances, which are defined as “dispute[s] concerning the interpretation or application of the terms or provision of the agreement,”
 
 see
 
 Maryanski Aff. [Doc. 36] Ex. C ¶ 10.2, and points out Smith and Maryanski’s failure to identify in their moving papers any term or provision of the agreement pursuant to which Malla’s removal would constitute a grievance under the agreement giving rise to the detailed procedural protections available under it for grievances.
 

 Second, Malla argues that any process otherwise available to him in the collective bargaining agreement is not legally relevant to the due process calculation because, under the terms of the agreement, Malla’s use of such procedure is “permissive,” Opp’n [Doc. #38] at 20, and does not require exhaustion,
 
 id.
 
 at 21. Malla points to Article 10.3 of the agreement:
 

 Request to Other Procedure. If prior to seeking resolution of a dispute by filing a grievance under this contract, or while the grievance proceeding is in progress, a member seeks to resolve the matter in any other forum, whether administrative or judicial, the Board shall have no obligation to entertain or proceed with this grievance procedure.
 

 See
 
 Maryanski Aff. [Doc. #36] Ex. C ¶ 10.3. Malla essentially concludes that, if the Court forces him to exhaust any grievance procedure previously available to him in the collective bargaining agreement, he will effectively have no claim because any such grievance would now be out of time.
 
 See
 
 Opp’n [Doc. # 38] at 21.
 

 Malla tells a different tale about his meetings with Regina Smith and defen
 
 *CCCLXVII
 
 dants. With respect to the sole pre-re-moval meeting of March 31, 2000, Malla states he was not told about the subject matter of the meeting beforehand,
 
 see
 
 Malla Depo. (03/14/2003) at 31:1-12, was asked to resign his position as Campus Director but not told he would be removed if he refused to do so,
 
 see
 
 Malla Aff. ¶ 9, 11, was told that the resignation was requested “because of a letter received from the Provost of the University of Hartford ... claiming difficulty-in communications with Sallie S. Townsend,”
 
 id.
 
 at 11, was not informed of any investigation or review,
 
 see id.,
 
 was not provided with a copy of the referenced letter,
 
 see id.,
 
 and was not referred to or presented any other evidence other than the letter,
 
 see id.; see also
 
 Malla Depo. (03/14/2003) at 34:1-3. He says the first time he received a copy of Townsend’s letter was June 5, 2000,
 
 see id.
 
 ¶ 18, and that he was not interviewed about the allegations in Townsend’s letter,
 
 see id.
 
 ¶ 19. A memorandum dated June 12, 2000 and written by Erling Murtha-Smith, Head of the Department of Civil and Environmental Engineering, to Maryanski expresses serious concerns regarding the manner in which Malla was removed from his position as Campus Director:
 

 ... As I have detailed in previous memos, I reiterate that your administration did
 
 not
 
 follow due process in regard to the removal of Professor Malla as Campus Director for the Space Grant Consortium. He was not informed what the substance was for the removal, and he was not and has not been given an opportunity to respond to any allegations. Your administration has chosen to accept the “allegations” of the Townsend December 13, 2000 letter as truth and just cause, without offering Professor Malla any opportunity to rebut.
 

 The package of emails and letters handed over by VP Smith at the June 2nd meeting did not substantiate the case for removal.... none of the emails in the package substantiates the allegations in the Townsend letter.
 

 It is my understanding that the first time Professor Malla has seen the Townsend letter and its allegations was at the recent June 2nd meeting. That was just ten days ago but over 5 months
 
 after
 
 the date of the letter, two months after VP Smith’s meeting with Professor Malla asking him to step down, and over a month since the removal of Professor Malla from the position. Indeed, to the best of my knowledge, your administration failed to present the allegations at any time to Professor Malla before, at, or subsequent to the March 31, 2000 meeting with Robert Smith and Regina Smith, and the subsequent removal of Professor Malla as Campus Director of the Space Grant Consortium. Since Professor Malla had
 
 not
 
 seen or heard the allegations of the Townsend letter, he was not able to rebut any of the allegations in the three months between the probable receipt of the letter and the removal action. Further, he has not been in a position to rebut any of the allegations until after the June 2nd meeting....
 

 Meanwhile, following the March 31st, 2000 meeting, Professor Malla, myself and Dean Faghri had each independently asked for more information on the reasons for the action. None of us have received any information.
 

 See
 
 Murtha-Smith Mem. (06/12/2000) at 2. Finally, contemporaneous and just subsequent to the March 31, 2000 meeting, Mal-la wrote defendant Smith, informing him that he would not step down and recalling, “You neither elaborated on [Townsend’s and the Provost of University of Hartford] specific concerns nor attempted to get my
 
 *CCCLXVIII
 
 view points on the issues raised by them.” Malla Electronic Mail (04/11/2000).
 

 2. Discussion
 

 From the above summary judgment record, the Court concludes that underlying factual disputes preclude granting summary judgment in favor of defendants Smith and Maryanski on Malla’s due process claim. A public employee dismissa-ble only for cause is entitled to a pre-termination hearing prior to being terminated as “ ‘an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.’ ”
 
 Gilbert,
 
 520 U.S. at 929, 117 S.Ct. 1807
 
 (quoting Cleveland Bd. of Educ. v. Loudermill,
 
 470 U.S. 532, 545-46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Such process “ ‘need only include oral or written notice of the charges, an explanation of the employer’s evidence, and an opportunity for the employee to tell his side of the story.’ ”
 
 Id. (quoting Loudermill,
 
 470 U.S. at 546, 105 S.Ct. 1487). However, “due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances [but] is flexible and calls for such procedural protections as the particular situation demands,”
 
 id.
 
 at 930, 117 S.Ct. 1807 (quotations and citations omitted), and thus not every form of discipline of a public employee short of termination, for example, suspension or removal from a particular position, necessarily triggers a due process requirement of a pre-deprivation hearing and opportunity to be heard.
 
 See e.g. id.
 
 at 930-935, 117 S.Ct. 1807.
 

 The determination of what process is due is analyzed under the well known three pronged balancing test of
 
 Mathews v. Eldridge,
 
 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):
 

 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probably value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest.
 

 Defendants here do not analyze in a systematic manner the evidence under this test. With respect to the private interest, defendants press that, as a matter of law, Malla’s position is not a federally protected property right. The Court disagreed with this contention above. It is, however, difficult from this record to determine exactly how significant is Malla’s interest in the Campus Director position. Dr. Murtha-Smith’s letter of June 12, 2000 considers Malla’s interest in the grant at a very high level in light of Malla’s status as principal drafter, generator, and investigator on the grant and his assemblage of the corresponding investigative team. Malla’s electronic mail to defendant Smith dated April 12, 2000, further describes his lead role in the establishment of the Consortium. Thus, on the present record, a jury could conclude that Malla’s interest in the Campus Director position in charge of the grant he himself had obtained was quite significant in the academic community and the removal from this position correspondingly not an insignificant matter. Finally, analogous to terminations, the removal was a permanent decision of potentially indefinite duration, particularly where, as here, Malla was replaced shortly after his removal from this singular Campus Director position.
 

 UConn has really made no attempt to demonstrate its interest, particularly as it regards removal of Malla without enhanced pre-deprivation procedures. UConn’s interest in maintaining good working relationships with the individual in charge statewide of the Consortium may
 
 *CCCLXIX
 
 well be significant but a deeper factual record would be required to determine how significant. Weighing against concluding the existence of significant state interest in speedy action are two timing factors: First, UConn was aware of the problems between Townsend and Malla at least as of July 1999, but did not ultimately act to remove Malla until April 14, 2000. Time apparently was not of the essence. Second, Malla had held the Campus Director position for nine years and was the individual responsible for having created it. An additional couple of months may not have caused irreparable damage. Both the timing factors as well as Regina Smith’s investigation demonstrate that this was not a sudden, unpredictable, or random deprivation requiring only post-removal remedies.
 
 See e.g., Ezekwo,
 
 940 F.2d at 784.
 

 The last
 
 Mathews
 
 factor, risk of erroneous deprivation and likely value of any additional procedures, weighs in favor of Malla. Malla’s version of events, which must be accepted by the Court at summary judgment, as bolstered by the observations of Dean Murtha-Smith depict a pre-removal process by which Malla was provided orally the barest outline of the charges against him at an informal meeting to which he was invited without knowledge of the subject matter, was not told the consequence of refusing to resign, was not provided with any evidentiary supporting basis other than an oral representation (and how specific is unclear) about the allegations of Townsend’s letter, and was not permitted at any time to offer evidence or attempt to rebut the specific allegations contained in the letter.
 

 Crediting Malla’s version of pre-removal events and Dr. Murtha-Smith’s observations about the importance of Malla’s interest in his position, coupled with UConn’s seemingly low level interest in speedy removal of Malla, could support a conclusion that Malla was due greater pre-deprivation process than he was provided by defendants Smith and Maryanski. While, without the benefit of a full trial record, the Court cannot delineate the precise contours of exactly what process Malla was due, it is sufficient here to note that, under the
 
 Mathews
 
 balancing of the summary judgment record, he was due more than his version of events demonstrate he received.
 

 Defendants predominantly rely on the post-removal procedures they say were available to Malla in the AAUP’s collective bargaining agreement. This argument is unavailing. First, as Malla points out, defendants do not point the Court to any provision of the agreement pursuant to which Malla’s removal would have qualified as a “grievance” as that term is defined in Article 10.2 of the agreement versus merely the “problem” of Article 10.1 such that Malla would be entitled to the procedural protections set forth therein. This is not an insignificant point because, at least at the step one grievance stage, it is the administration that decides whether the “problem” raised pursuant to Article 10.1’s open communication meeting rises to the level of a “grievance” requiring the administration to notify the AAUP in writing of the terms of the settlement of the “problem.”
 
 See
 
 Maryanski Aff. [Doc. # 36] Ex. C 10.4A. Second, although the availability of post-deprivation procedures, even if timely (and here, the Court notes the six week gap between Malla’s removal and the open communication meeting of June 2, 2000), can, under certain circumstances, excuse lack or absence of pre-deprivation procedure, the cases cited by defendants in support of Malla’s collective bargaining agreement so applying in this case are distinguishable. For example, in
 
 Naru-manchi,
 
 Judge Newman concluded that the
 
 pre-deprivation and hearing rights
 
 available in a tenured university profes
 
 *CCCLXX
 
 sor’s collective bargaining agreement provided any process due under the facts of that case, notwithstanding the professor’s failure to appear at his pre-suspension hearing, which happened after he received written warning of the offending conduct and the university’s intent to suspend based on a violation of the collective bargaining agreement, and even after the rescheduling of the intent to suspend hearing at the professor’s request.
 
 See Narumanchi,
 
 850 F.2d at 71-72. The facts of
 
 Naru-manchi
 
 are plainly not analogous to the present summary judgment record.
 
 [30]
 

 IV. Conclusion
 

 For the reasons set forth above, Defendant’s Motion for Summary Judgment [Doc. # 32] is GRANTED in PART with respect to Malla’s Title VII claim, but DENIED in PART with respect to his due process claim.
 

 IT IS SO ORDERED.
 

 [1]
 

 . While plaintiff mentions UConn in this count, he requests relief from the alleged violation of 42 U.S.C. § 2000d only against University of Hartford and Townsend.
 
 See
 
 Sec. Am. Compl. [Doc. 16] ¶¶ 54, 55.
 

 [2]
 

 . Plaintiff's second amended complaint clearly alleges a due process violation against individual defendants Smith and Maryanski but makes no mention of such violation against defendant UConn.
 
 See
 
 Sec. Am. Compl. [Doc. # 16] ¶¶ 56-60. Thus, the Court understands plaintiff's count five to allege University of Hartford's and Townsend's aiding and abetting of Smith's and Maryanski's alleged due process violation notwithstanding that the second amended complaint speaks of aiding and abetting UConn in depriving plaintiff of due process.
 
 See id.
 
 ¶ 65.
 

 [3]
 

 .
 
 See also id.
 
 at 10-11 (quotations and citations omitted, emphasis in original):
 

 "Malla is unable to demonstrate that there were other similarly situated individuals who were treated differently than the Plaintiff. ... [T]he plaintiff has a burden to demonstrate that another Director at the University of Connecticut, not in the Plaintiff's protected class, was allowed to remain as Director despite similar reports of difficulties in communications or interpersonal relations. The Plaintiff cannot sustain this burden. In the alternative, the Plaintiff states in his Complaint that the University removed him as Campus Director and appointed a white male, Daniel Civco, to replace Plaintiff as Campus Director.... The Plaintiff is factually incorrect in asserting that Mr. Civco is a person similarly situated to provide circumstances giving rise to an inference of discrimination. ... Mr. Civco was not serving in the Director appointment at the same time as the Plaintiff, but rather followed the Plaintiff in the appointment. ... Also, there exists no evidence or information that Mr. Civco was ever found to have difficulties in communications and interpersonal relations with any colleague from the Consortium, nor has there ever been any occasion or circumstance whereupon the NASA Program Manager supported the removal of Mr. Civco. Accordingly, the Plaintiff has failed to demonstrate that another similarly situated individual
 
 engaging in conduct similar to the Plaintiff
 
 was treated in a different manner.”
 

 [4]
 

 . At this stage in the analytical framework of
 
 McDonnell Douglas,
 
 "[a]lthough intermediate evidentiary burdens shift back and forth ..., the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."
 
 Reeves,
 
 530 U.S. at 143, 120 S.Ct. 2097 (quotation omitted);
 
 see also Schnabel,
 
 232 F.3d at 88 n. 2.
 

 [5]
 

 . Malla objects to the Court's consideration of Regina Smith's affidavit on the grounds that defendant UConn "did not claim Regina Smith as their witness in their responses to Plaintiff's Interrogatories request, dated October 22, 2003.”
 
 E.g.,
 
 Local Rule 9(c)2 Statement [Doc. # 39] at 1 ¶ 6. Malla refers to this objection as a "Motion to Strike,” Opp'n [Doc. # 38] at 15, notwithstanding not having filed any such formal .motion. He appears to object to the affidavit on the grounds of surprise. Malla's objection has no merit. The interrogatory response to which Malla points stated “[n]ot determined at this time” to a question seeking identification of lay witnesses UConn intended to call at trial and of the facts to which such witnesses would testify.
 
 See
 
 Resp. to Interrogatories (01/02/2003) at 9 ¶ 21. In the very same responses provided by Malla, however, UConn explicitly identified Regina Smith twice as an individual integrally involved with the process of removing Malla from his position as Campus Director.
 
 See id.
 
 at 6 ¶¶ 7, 10.
 

 [6]
 

 .Regina Smith’s position required her to function as liaison to external funding agen
 
 *CCCLIV
 
 cies and provide institutional support and assistance for funded proposals.
 

 [7]
 

 . As clarified by plaintiff's submissions, discussed
 
 infra,
 
 the second meeting was held after removal at the request of Malla’s AAUP representative, Edward Marth, Executive Di
 
 *CCCLVI
 
 rector of the University of Connecticut Chapter of AAUP. Also present at the June 2, 2000 meeting were Maryanski, Mr. Marth, Virginia Miller, Assistant Vice Chancellor for Human Resources, and Dr. Erling Murtha-Smith, Department Head of Civil Engineering.
 
 See
 
 Maryanski Aff. [Doc. # 36] ¶ 11.
 

 [8]
 

 . For example, on July 25, 1999, Malla sent Regina Smith a three page single spaced electronic mail that attaches a July 22 electronic mail from Townsend to Malla and, in six enumerated paragraphs first quotes from Townsend's correspondence and then in detail explains what is either factually or otherwise incorrect or problematic with Townsend’s statements.
 
 See e.g.,
 
 Electronic Mail of Malla to Regina Smith dated July 25, 1999 at 1-4. Upon temporaiy resolution of the issue, Malla sent an electronic mail to Townsend dated July 28; conceding, "[t]he Thrust Area Coordinators have all agreed to abide by your dictates in the matter of the grant’s management....”
 
 See
 
 Electronic Mail of Malla to Townsend (copied to Regina Smith) dated July 28, 1999 at 1.
 

 [9]
 

 .
 
 See e.g.,
 
 Electronic Mail of Townsend to Malla (forwarded to Regina Smith) dated August 10, 1999 ("Due to unresolvable differences as to the direction of the affiliates committee, I am replacing you immediately as chair. This decision is irrevocable.”); Electronic Mail of Malla to Townsend (forwarded to Regina Smith) dated August 10, 1999 (“I am responding to your e-mail message of August 05 (appended below). I strongly disagree that the Committee on Consortium Membership is 'off-task.' ... Clearly, the strategic plan, as you seem to indicate now, is outside [the Committee's] scope.... Any constructive comments ... will be greatly valued-”).
 

 [10]
 

 .
 
 See e.g.,
 
 Electronic Mail of Malla to Regina Smith (copied to Robert Smith) dated August 25, 1999 ("Bringing a new director aboard in most likelyhood (sic) will not fix the problems when there are serious underlining issues accumulated for so many years. I strongly believe that we need a strong new leadership for the Consortium.... And that is in my mind ... [UConn].... As a matter of fact, I still have to see any sign of new vision and injection of new enthusiasm (in action) from the new director.”).
 

 [11]
 

 .In an attempt to quell the compendium dust up, Civco sent a reply to Malla, stating, "Come on now. I had e-mailed you last week that I had three copies of the compendium, and asked that you send someone over to 'fetch' it, as you put it, if you couldn't make it yourself. Well, Ed managed to come to receive his copy. And since you hadn’t come as of yesterday morning, I personally delivered your copy to your office after my class ended at 10:00 and before a 10:30 appointment ... it took me only 15 minutes for the round trip between Young and Castleman.” Electronic Mail of Civco to Malla (forwarded to Regina Smith) dated approximately September 1, 2000.
 

 [12]
 

 . Q. That particular e-mail falls into your definition of broadcase e-mail?
 

 A. Absolutely.
 

 [13]
 

 . Q. Let's take it one at a time. Do you have any written evidence to support your contentions in the bullets?
 

 A. I'm not sure. Perhaps Laurie has some.
 

 Q. Okay. When you say you're not sure, are you not sure of the form of the written evidence?
 

 A. I don’t think I have any written evidence. I don't know what Laurie has. Some of
 
 *CCCLIX
 
 this came from Laurie, some of it was my personal experience.
 

 [14]
 

 . Q. Who did it go to, specifically?
 

 A. Well, as indicated in the bullets at the bottom of the page, there was a student that had reported negative activity. David Atkinson reported to Laurie Granstrand about negative activity. We got complaints, at least one complaint from Judy Donnelly at Three Rivers College, who was badly treated as a token member of EPSCOR, bullet 3. Bullet No. 4 had to do with EPSCOR management.
 

 Q. Did you receive these complaints directly?
 

 A. I received them. Laurie Granstrand received the three I just mentioned: The student, Dave Atkinson called her to complain about behavior out of Johnson Space Flight Center, this is what she told me; and then I believe it was Judy Donnelly— I believe that’s the name, that’s easy to check— talked to Laurie about how she was treated.
 

 Q. That’s your letter; is that correct?
 

 A. That's correct. But I trust Laurie completely. I never found her to lie or in any way to mislead me. We were a team managing this. But as director, I wrote the letter; my signature is on it.
 

 [15]
 

 . Q. Did you specifically hear this token statement?
 

 A. The token statement was made to Laurie Granstrand.
 

 Q. Okay. The token statement was made to Laurie Granstrand from Ramesh Malla?
 

 A. From the person to whom he made the statement about being a token, the Three Rivers participant in his program, who I believe was Judy Donnelly. I’m not sure of the name. That’s why I say believe. I would have to look it up.
 

 [16]
 

 . Q. Ramesh constantly opposed you?
 

 A. Consistently.
 

 Q. Consistently?
 

 A. Yes.
 

 Q. Let me ask you how he consistently opposed you?
 

 A. For instance, he was— on April 8th of '99, NASA came up to have a meeting with the consortium to talk about how we could make the consortium better. The result of that was three task forces to look into issues. Ramesh volunteered to be in charge of the one to deal with the affiliate discussion. I kept giving them guidelines of what I was looking for. What came back was how they were going to turn it into a democracy. When you're fiscally responsible for a grant, you can't have a demoncra-cy-
 

 Q. That was the way he opposed you?
 

 A. That was one of the ways. And I can point to documentation if you look at the three drafts.
 

 [17]
 

 . Q. Now, the second sentence on the letter dated 12/13/99, in paragraph 3, you used the term "petty issues,” correct?
 

 A. That's correct.
 

 Q. Okay. Now, can you define what— can you tell me what these petty issues were?
 

 A. Specifically, I remember one, and that was he called them to ask for a title.
 

 Q. Called to ask for a—
 

 A. Title.
 

 Q. T-I-T-L-E?
 

 A. That’s correct.
 

 Q. Well, how did you find out that he was seeking this title?
 

 A. I got a voice mail telling me he was seeking a title, a voice mail from — - I don’t remember if it was Julius or Diane, one of the two.
 

 [18]
 

 . Q. Can you tell us who collaborated or assisted you in drafting the December 13, 1999, letter which is marked as Exhibit 3?
 

 A. Yes. Vin Greenan and Laurie read through it, being the space grant office. Betty Ivey had me include a sentence, Betty then being the provost of the university. My dean, Alan Hadad, had been with the program from the beginning; I’m sure I gave it to him to read before I sent it out. I did not do this willy-nilly. I went through the channels. The dean saw it, the provost saw it and corrected a piece, and Laurie and Vin. I saw an e-mail from Laurie when I was reviewing that said they looked through it and they made corrections.
 

 Q. Is there anything in [the December 13, 1999 letter] as you look at it today that's untruthful?
 

 A. No.
 

 [19]
 

 . Plaintiff appears to insinuate that a jury could also find the allegations in the Decern-
 
 *CCCLX
 
 ber 13, 1999 letter from Townsend to Maryan-ski baseless because Townsend "has not responded to a request to produce copies of broadcast e-mails..., [a]nd Townsend failed to adequately identify witnesses, although lawful (sic) requested to do so.” Opp'n [Doc. # 38] at 8. The supporting parts of Townsend’s deposition testimony, Townsend’s responses to interrogatories, and follow up letters submitted by plaintiff demonstrate only that plaintiff requested information, Townsend divulged and turned over some of the requested information, and Townsend agreed to look for more information and turn it over, if found. Plaintiff has never made any motion to compel or otherwise indicated that compliance with discovery obligations was wanting.
 

 [20]
 

 . Q. ... What led to this letter dated April 14, 2000 was the letter dated December 13, 1999 marked as Plaintiff's Exhibit 3?
 

 A. Not entirely, Mark, because I testified that the letter just triggered a whole series of conversations and fact-finding by Gina and some information that she was gathering from the University of Hartford and passing that on to me. So the picture that emerged over a few months' time seemed to confirm the allegations that Sallie Townsend made in her letter of December 13th.
 

 Q. The fact-finding of Regina Smith?
 

 A. Yes.
 

 [21]
 

 . Q. And when you saw these allegations raised in [Townsend’s December 13, 1999 letter] ..., did you give plaintiff an opportunity to rebut the allegations raised in that letter?
 

 A. I, again, Mark, as I mentioned earlier, delegated responsibility to Gina Smith to follow up and find out what the problems were, what difficulties there were and whether there could be any kind of remediation if there were problems. And she reported to me on a number of occasions that the allegations in the letter were correct.
 

 [22]
 

 . A. Again, the [December 13, 1999 letter] was not a great revelation to us. We had been hearing concerns, and that was really one of the first times we had gotten something formally in writing.
 

 [23]
 

 . Q. Okay. In terms of the letter itself, you said that UConn requested it?
 

 A. Yes.
 

 Q. Could you tell us who at UConn requested the letter dated December 13, 1999?
 

 A. I don’t remember. Maybe Bob Smith. He was Gina's boss. May have been Fred [Maryanski],
 

 [24]
 

 . "I believe there are some documents that document this relationship between the University of Connecticut and the Space Grant Consortium and the University of Hartford, and I believe in those documents, it indicates that the person serving in that vice provost role has the authority to appoint and to terminate an appointment of a person in the role that Dr. Malla had."
 

 [25]
 

 . "My understanding is that the appointing authority for this position was through the office that I served. I also had a directive from Fred Maryanski to investigate this matter, and if, in fact, it was my finding that Dr. Malla was not a suitable continuing coordinator, that I was to essentially take this kind of action. So I derived some authority as well from the chancellor of the University.”
 

 [26]
 

 .
 
 See
 
 Opp’n [Doc. #38] at 19 (citing Robert Smith Depo. (03/24/2003) at 51:14-52:12 but not submitting corresponding pages in attached Exhibit 3; and citing Malla Depo. (03/14/2003) at 27:19-28:16 and 127:9-16 but not submitting corresponding pages in attached Exhibit 8).
 

 [27]
 

 . The Supreme Court has left open the question of whether discipline of tenured public employees short of termination is afforded protection under the Due Process Clause.
 
 See Gilbert v. Homar,
 
 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997).
 

 [28]
 

 . Although defendants’ brief formally divides procedure available under Malla’s collective bargaining agreement with that provided by meetings with university officials, all such evidence speaks to the second prong of a due process analysis.
 
 See e.g., Narumanchi v. Board of Trustees of Connecticut State Univ.,
 
 850 F.2d 70, 72 (2d Cir.1988).
 

 [29]
 

 . The full section reads as follows:
 

 "The parties agree that all problems should be resolved whenever possible before the filing of a grievance and encourage open communication between administrators and members, so that the formal grievance procedure will not normally be necessary.”
 

 See
 
 Maryanski Aff. [Doc. #36] Ex. C ¶ 10.1.
 

 [30]
 

 . The Court notes, however, that Malla’s characterization of the collective bargaining agreement as permissive and thus not requiring exhaustion of remedies evinces a misunderstanding of the nature of a due process claim. Due Process is concerned with what process is used or available to an individual both pre and post deprivation of constitutionally protected property, and thus process available under a collective bargaining agreement is one factor in the calculus of determining whether the individual received all process due. See
 
 Narumanchi,
 
 850 F.2d at 72.